**Elmo J. GILBERT, on behalf of himself and all others similarly situated, Plaintiff-Appellant,**

v.

**WOOD ACCEPTANCE CO. et al., Defendants-Appellees.**

**No. 72–1617.**

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1973.

Decided Oct. 24, 1973.

---

Ronald W. Fritsch, Legal Aid Society of Chicago, Chicago, Ill., for plaintiff-appellant.

Max Wildman, David L. Schiavone, Chicago, Ill., for defendants-appellees.

Before PELL and STEVENS, Circuit Judges, and REYNOLDS,* District Judge.

PELL, Circuit Judge.

This appeal concerns the interpretation of the Truth-in-Lending Act (Title I of the Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq.), as implemented by Federal Reserve Board Regulation Z, 12 C.F.R. § 226. Appellant Gilbert, who signed a retail installment contract for the purchase of a used automobile from Southland Motors, Inc., (Southland) contends that the contract fails to disclose several items of information allegedly required to be disclosed by Section 128(a)(2) and (8) of the Act, 15 U.S.C. § 1638 (a)(2) and (8), and subsection 226.8 of the Regulation. Pursuant to 15 U.S.C. § 1640, he seeks a judgment for a penalty of $197.72, twice the finance charge due under the contract. The defendants are Southland and Wood Acceptance Co. (Wood), the assignee of the installment contract.[1] The district court granted the defendants' motion to dismiss the complaint, holding that even if all of Gilbert's allegations were taken as true the complaint failed to state a claim upon which relief could be granted.

The complaint alleges that on March 6, 1971, Gilbert, a "consumer," entered into a retail installment contract with Southland, a "creditor," for the purchase of a used automobile; that on or after

---

* Chief Judge John W. Reynolds of the Eastern District of Wisconsin is sitting by designation.

1. The complaint also purported to be a class action on behalf of all other customers of Wood and Southland to whom the defendants on and after March 6, 1971, had failed to make the disclosures alleged in the complaint to have been required by law. For the class action aspect of the action, Gilbert named a third defendant, Deluxe Motors, Inc., a used automobile dealership supposedly owned by the same person or persons who owned Wood and Southland. The district court did, not rule on the propriety of the action proceeding as a class action or on whether Deluxe was a proper party-defendant. Consequently, we do not treat those issues on this appeal.

March 6th, Southland assigned the contract to Wood, a "creditor"; that Southland and Wood are owned by the same persons; and that Wood had actual knowledge of all aspects of the March 6, 1971, transaction. The complaint further alleges that the contract, although reciting on its face that it includes "disclosures required by Federal law," fails to comply with the applicable law: (1) the contract falsely states that plaintiff paid a "cash downpayment" of $350, when in fact the "cash downpayment" was only $100 and Gilbert was obligated to pay the $250 balance in four weekly installments ($100 on March 8, 1971, and $50 thereafter through March 29, 1971) to one "M. Wishner," an agent of the defendants; and (2) the contract also states that the "total of payments" was $948.86, payable in 38 weekly installments of $24.97 each, beginning April 5, 1971, but the total of payments was really $1198.86, payable in 42 weekly payments beginning March 8, 1971.

The first "false statement" supposedly violates subsection 226.8(c)(2) of Regulation Z, which requires that a creditor disclose "[t]he amount of the downpayment itemized, as applicable, as downpayment in money, using the term 'cash downpayment,' downpayment in property, using the term 'trade-in' and the sum, using the term 'total downpayment.'" The second asserted misstatement allegedly contravenes Section 128(a)(8) of the Act and subsection 226.8(b)(3) of the Regulation. Those provisions require a creditor to disclose "the number, amount, and due dates or periods of payments scheduled to repay the indebtedness and . . . the sum of such payments using the term, 'total of payments.' If any payment is more than

twice the amount of an otherwise regularly scheduled equal payment, the creditor shall identify the amount of such payment by the term 'balloon payment' and shall state the conditions, if any, under which that payment be refinanced if not paid when due." [2]

In his brief, Gilbert further particularizes the charges he made in his complaint. The most important of these points—the one on which the validity of plaintiff's other contentions hinges—is defendants' supposed failure to disclose accurately in the contract the "amount of downpayment itemized" and the "cash downpayment." On the date the parties executed the contract, Gilbert paid Southland $100 in cash. He characterizes this amount as the "downpayment in money" or "cash downpayment." The "total downpayment" agreed upon was $350 (which fact, plaintiff admits, the contract reveals). Because the $250 difference between the "total downpayment" and the $100 Gilbert gave to Southland on March 6th was to be paid in four weekly installments, Gilbert argues that the $250 cannot accurately be deemed part of the "cash downpayment" and should not have been noted as such in the contract. The crucial inquiry, therefore, is whether the applicable law requires that the contract disclose expressly the $250.

No provision of the Consumer Credit Protection Act directly addresses this issue. Subsection 226.8(c)(2) of Regulation Z seems to be of help, for it speaks, *inter alia,* of disclosing "[t]he amount of the downpayment itemized, as applicable, as downpayment in money, using the term 'cash downpayment,' downpayment in property, using the term 'trade-in'

---

2. We note that Gilbert was to pay the $250 in four installments, each of which was more than twice the amount of the $24.97 weekly installment he was to make beginning April 5, 1971. Gilbert maintains that the $250 should, therefore, have been identified in the contract as "balloon payments." The defendants contest this, arguing that the $250 was not part of the "repay[ment] of the indebtedness." Because we have approached the central issue of this appeal—whether the district court erred in dismissing the complaint—from a different perspective, we need not resolve this controversy.

and the sum . . . ." However, as the parties' differing interpretations of this provision of the Regulation indicate, it is somewhat ambiguous.

The defendants read the provision as establishing exclusive subclassifications. That is, when disclosing in a contract the items of which the downpayment consists, a creditor is limited to the terms "cash downpayment" and "trade-in." If that is so, then "cash downpayment" supposedly more aptly describes the $250 that Gilbert was to pay than "trade-in" does. Presumably the $250 is properly considered part of the downpayment not only because the parties characterized it as such but because Gilbert was allowed to pay it in installments without a finance charge and prior to the commencement of the 38 uniform, "interest-included" installments.

The plaintiff, in contrast, maintains that "cash downpayment" and "trade-in" are merely examples. He points out that the "section does not state that these are the only items or ingredients of the 'total downpayment.'" He calls to our attention the following official interpretation of Regulation Z issued by the Board of Governors of the Federal Reserve System on September 11, 1969:

### § 226.504 *Treatment of "Pick-up Payment" in an Instalment Contract*

In some instances involving an instalment contract arising from a credit sale, the purchaser may not pay the full amount of the required downpayment at the time he signs the contract or otherwise enters into the credit transaction. In such cases, the creditor may include in the instalment contract or accept a separate obligation for the unpaid portion of the downpayment, commonly called a "pick-up payment," the amount of which usually carries no finance charge and is to be paid on or before a specified date independent of the other scheduled payments.

The question arises whether the "pick-up payment" must be treated as part of the "amount financed" for purposes of disclosure and determination of the "annual percentage rate" or whether it may be treated as a deferred portion of the downpayment.

In determining the "amount financed" the creditor may exclude the amount of the "pick-up payment" provided that:

(1) The amount of the finance charge applicable to the transaction does not exceed the amount that would have been imposed had the required down payment been paid in full upon consummation of the transaction; and

(2) The due date of the "pick-up payment" is not later than the due date of the second payment otherwise scheduled.

In making the disclosures required under § 226.8(b)(3), if such "pick-up payment" is more than twice the amount of an otherwise regularly scheduled equal payment, the creditor shall state the conditions, if any, under which such "pick-up payment" may be refinanced if not paid when due; and such "pick-up payment" may be identified using that term or the term "balloon payment."

It is obvious that the primary aim of § 226.504 is to clarify when a creditor must include the pick-up payment in the "amount financed." However, it is not so certain that the section supports the plaintiff's claim that "deferred downpayments" must be separately listed in a contract. Gilbert asserts that, in the final paragraph of the Interpretation, the Board was construing the disclosure requirement of subsection 226.8(b)(3) as including the "unpaid portion of the

downpayment" or "pick-up payment."[3] In rebuttal, the defendants emphasize the use of the word "may" in the Interpretation and cite the grammatical usages provision of the original Act, Section 503. They also argue that it is illogical to construe subsection 226.8(b)(3), which involves repayment of the "indebtedness," to include a deferred downpayment where the downpayment is excludable, as is the case here, from the "amount financed." That phrase includes the "unpaid balance of cash price," which is defined as the difference between the "cash price" and the "total downpayment."

To resolve the central issue of this appeal, it is necessary, we think, to avoid becoming embroiled in such a verbal controversy. One purpose of the Consumer Credit Protection Act was to assure that customers will "avoid the uninformed use of credit." 15 U.S.C. § 1601. Although the disclosure of information pertaining to the finance charge imposed for a transaction is important in achieving this goal, Congress did not limit the the required disclosures to such data. Further, it delegated broad authority to the Federal Reserve Board to render the Act effective. 15 U.S.C. § 1640. *See* Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

■ The retail installment contract executed by Gilbert and Southland clearly does not disclose in full the terms of the transaction between the parties.

One cannot know from reading the contract that Gilbert was obligated to pay $250 in four installments as part of the agreed-upon downpayment of $350. That the customer was to pay no finance charge on the $250 does not mean, as we have indicated, that the Act or regulations promulgated under the Act might not require the separate disclosure of the "deferred downpayment." Further, although the Act itself does not explicitly refer to the credit sale where the purchaser does not pay the full amount of the required downpayment at the time he signs the contract, the Board in Interpretation § 226.504 acknowledged the existence of such arrangements and, correctly, decided that the Act, which, with a few exceptions, applies to the entire genus "consumer credit transactions," regulates disclosures for the "deferred downpayment" type of transaction.

■ With these points in mind, we turn again to 15 U.S.C. § 1638(a)(2) and subsection 226.8(c)(2) of Regulation Z. The words "The amount of the downpayment itemized" in the subsection call for the particularization of the sum required to be reported by Section 1638(a)(2). Because Interpretation § 226.504 establishes that the Board treats "deferred downpayment" situations as being among those transactions for which it has responsibility under Congress's mandate, it follows that subsection 226.8(c)(2) is to be interpreted as applying to those situations. By engaging in a dispute about the meaning of "trade-in,"

3. Gilbert also refers us to a letter written by Milton W. Schober, Assistant Director, for the Board of Governors in response to an inquiry the Board received:

This is in response to your recent inquiry regarding the method of disclosing a "pick-up payment" as described in our interpretation of § 226.504 issued under date of September 11, 1969.

In order to exclude the amount of a "pick-up payment" from the "amount financed" pursuant to that interpretation, the amount of the "pick-up payment" may be shown in the disclosure statement as a deferred portion of the "cash down payment" under the provisions of § 226.8(c)(2), or it may be shown as a deduction from the amount disclosed under § 226.8(c)(5); however, in either case, it must be clearly identified as required in the final paragraph of interpretation § 226.504. [Letter dated October 28, 1969, excerpted in 4 CCH CONSUMER CREDIT GUIDE. ¶30,204.]

Although the letter is not free from ambiguity, it does seem to support plaintiff. However, because it is not an officially promulgated rule or interpretation by the Board, it is not binding on the parties to the present action.

the parties have lost sight of the purpose of (c)(2): to aid the consumer, creditors are to "break down" the downpayment the consumer is obligated to make. The items of which the downpayment consists are, therefore, the required data. The creditor is to set out the form in which the downpayment is to be made, *i. e.*, cash, property, or both. To emphasize the Board's suggestion or requirement that certain phraseology be used is to focus on an incidental matter. *Cf.* 15 U.S.C. § 1632(a). Surely a legally binding promise to pay a specified amount of money in the future is a form of property to the promisee. We cannot agree that the inclusion of "deferred downpayment" in the definition of "downpayment in property" does violence to the common understanding of the word "property." [4] The "deferred" payment, therefore, should be stated separately in that part of the contract which breaks down the downpayment figure.[5]

In sum, we do not think the semantical subterfuge of treating "pick-up payments" as a deferred but unspecified portion of the "cash downpayment" satisfies the avowed purpose of the Act "to assure a meaningful disclosure of credit terms." This is so although we do recognize that because monthly payments, not only for necessities but for luxuries, have become a way of life in the American scene, many of those persons who periodically parcel out their paychecks are fully aware of the payments they must make. In our opinion, to conceal an unpaid part of the sales price in the category of "cash downpayment" is to evade both the letter and the spirit of this remedial legislation.

Accordingly, we hold that the district court incorrectly dismissed Gilbert's complaint for failure to state a claim upon which relief can be granted. The order of dismissal is vacated, and the cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

4. We note that combining "deferred" with "downpayment" might seem to present a conceptual difficulty since "down" might, to some, connote immediacy whereas "deferred" suggests future action.

5. If the defendants are genuinely concerned that they must use certain "magic words," we see no reason why they may not disclose the deferred downpayment information in the blanks on their form beside the term "Trade In."