Samuel M. MEADOWS, Plaintiff,

v.

CHARLIE WOOD, INC., Defendant.

Civ. A. No. 77–74–MAC.

United States District Court,
M. D. Georgia,
Macon Division.

April 7, 1978.

Robert E. Steele, Jr., Macon, Ga., for plaintiff.

Bruce M. Hofstadter of Westmoreland, Patterson & Moseley, Macon, Ga., for defendant.

BOOTLE, Senior District Judge:

This case presents two questions:

First, whether the disclosure statement reflecting the sale of a boat, motor and trailer violated the Truth in Lending Act (TIL) requirements by listing $391.35 as a "Cash Down Payment", rather than adding it to the "Amount Financed", and

Second, whether this court has jurisdiction over the vendor's counterclaim for balance due as purchase price.

In response to plaintiff's complaint seeking $1,000 plus costs and attorney's fees under 15 U.S.C.A. § 1640, the defendant denies the alleged TIL violation and counterclaims for $1287.52 principal plus attorney's fees and costs. To said counterclaim, plaintiff alleges that the defendant is seeking a deficiency judgment and is not entitled thereto because of its failure to follow the provisions of Ga. Code Ann. § 96–909, which must be complied with in order to entitle one to a deficiency judgment.

### Truth in Lending

The first question involves a factual determination. The defendant had the boat, motor and trailer on display in a boat show at the Macon Mall. The plaintiff was attracted to this display on Wednesday, April 21, or Thursday, April 22, 1976, and discussed with Mr. Charles Wood, Jr. its purchase. Plaintiff testifies that Wood in their first conversation told him that the down payment would be $400; that he replied he did not have $400; that Wood then said plaintiff need not worry about the $400 and "could hold the down payment"; that later on Friday night, April 23rd when the papers were signed, "not a lot was said about the down payment." Plaintiff then testified that "nothing" was at that time said about it; that roughly three days after he picked up the equipment on Monday or Tuesday, April 26th or 27th, he paid Wood $50 and a week or so later another $30; that Wood was present at the time of both payments and on one of these occasions told him that plaintiff would have an open account on the down payment and could pay "a little at a time"; that Wood at no time pressed him for the balance or for any definite terms. Plaintiff recalls that the contract (which is also the disclosure statement) was signed Friday night, April 23rd, and that the down payment of $391.35 was on the contract when he signed it and that he did not ask Wood to change it. Then he adds in his testimony that "Wood said it had to be there."

All negotiations concerning the sale were conducted by plaintiff pro se and by Mr.

Wood on behalf of the defendant. Mr. Wood's account differs sharply from that of the plaintiff. Wood says when the plaintiff first approached him, Wood had with him the bank chart and that he was specific telling plaintiff that the down payment would be $391.35 and what the installment payments would be, etc.; that one or two days later Wood took from plaintiff a credit application and after the bank approved that application, Wood telephoned plaintiff's wife, telling her of the approval; that plaintiff then returned and after the contract was prepared, Wood went over it and discussed it with plaintiff, item by item. Plaintiff looked it over and signed it. Wood then explained to the plaintiff that the property would not be delivered until Monday because it had to remain in the boat show. The plaintiff, up until this point, had never indicated any inability or non intention to make the down payment. On the contrary, when he signed the contract he stated he had $300 in his pocket and could have the balance by Monday when he got the equipment. On Monday afternoon, or Tuesday, plaintiff came for the boat, motor and trailer. Wood wired the car to the trailer, gave plaintiff the warranty card, etc. and made up the bill of sale. The plaintiff then fumbled in his pockets and said he had left his checkbook at home. Plaintiff inquired whether it would be all right if he made the down payment the next day. Wood did not object to that suggestion, thinking that it sounded reasonable. Then too, all was hitched up and ready to go and plaintiff's wife was there waiting for him. Next day came, but not plaintiff. Wood telephoned and plaintiff said he would be in on Friday. Ever since then Wood has been demanding the down payment. Plaintiff came in once and paid $50 on it and Wood asked him where was the balance and plaintiff said he had some bills to come up and asked if he could pay it on the next Friday. Wood did not object to that suggestion, again thinking it sounded reasonable. Plaintiff came in once more, this time in Wood's absence, and left $30. Wood called him after that and gave him "a hard time". Plaintiff

would always promise payment within the next few days. Wood never agreed to accept installments on the down payment and always demanded payment in full.

Put to a credibility choice, this court finds that Wood's account is more probable, more reasonable, and indeed correct.

This being so, this factual situation is expressly covered by 15 U.S.C.A. § 1634 and 12 C.F.R. 226.6(g), which are identical and read:

> If information disclosed in accordance with this part is subsequently rendered inaccurate as the result of any act, occurrence, or agreement subsequent to the delivery of the required disclosures, the inaccuracy resulting therefrom does not constitute a violation of this part.

12 C.F.R. 226.6(g) in a footnote states more specifically:

> Such acts, occurrences, or agreements include the failure of the customer to perform his obligations under the contract and such actions by the creditor as may be proper to protect his interests in such circumstances. Such failure may result in the liability of the customer to pay delinquency charges, collection costs, or expenses of the creditor for perfection or acquisition of any security interest or amounts advanced by the creditor on behalf of the customer in connection with insurance, repairs to or preservation of collateral.

■ In *Anthony v. Community Loan & Inv. Corp.*, 559 F.2d 1363, 1369 (5th Cir. 1977), it is held that a borrower cannot be heard to say he was "required" to purchase insurance after she had signed documents clearly advising her that she was not so required. The court stated that "[A]bsent a claim of illiteracy, fraud or duress, no extraneous oral evidence can be presented by the plaintiff to prove that the defendant gave her the impression that the insurance was required. . . . In this situation therefore Georgia's parole evidence rule is not in conflict with the purposes of the federal statute." Similarly, the plaintiff Meadows cannot be heard to say that prior

to his signing the disclosure statement he was told there would be no cash payment required.

It results therefore that the disclosure statement is not subject to the attack made upon it.

### Jurisdiction of Counterclaim [1]

■ We are not concerned here with "pendent jurisdiction", a term which as generally used refers only to joinder of state and federal claims which "derive from a common nucleus of operative fact" and are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Wright, *The Law of Federal Courts*, § 19 (1970). Even if it were true, as it is not that this court could be said to have "pendent jurisdiction" over this counterclaim, it would be a discretionary jurisdiction. Its exercise would be determinable by the sound discretion of the court.[2] It has been held that pendent state law claims should not be routinely allowed in truth in lending cases. *Solevo v. Aldens, Inc.*, 395 F.Supp. 861 (D.Conn. May 29, 1975); *Ball v. Conn. Bank & Trust Co.*, 404 F.Supp. 1 (D.Conn. Nov. 11, 1975).

We are concerned with "ancillary jurisdiction" and however "ill-defined" that concept may be, it is clear that "[a]ncillary jurisdiction permits courts to hear compul- sory counterclaims, under Rule 13(a) . . but permissive counterclaims, under Rule 13(b), require independent jurisdictional grounds." Wright, *The Law of Federal Courts*, § 19 (1970); *Revere Copper and Brass, Inc. v. Aetna Cas. & Surety Co.*, 426 F.2d 709, 714 (5th Cir. 1970); *United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1080 (2nd Cir. 1970).

■ Inasmuch as the counterclaim suggests no independent jurisdictional grounds, the question becomes whether the counterclaim is compulsory or permissive only.

Rule 13(a) in effect says that a counterclaim is compulsory "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." In determining whether a counterclaim is compulsory, "[f]our tests have been suggested:

1) Are the issues of fact and law raised by the claim and counterclaim largely the same?

2) Would res judicata bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?

3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?

4) Is there any logical relation between the claim and the counterclaim?"

6 Wright and Miller, *Federal Practice and Procedure*, § 1410 (1971).

The cited text indicates that in each of these tests, an affirmative answer to the

---

**1.** The fact that plaintiff does not raise the jurisdictional question does not make that question go away. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3).

**2.** "The Court [in *Gibbs, supra*] distinguished sharply, however, between constitutional power and discretionary exercise of that power. Even before *Gibbs*, some lower courts had recognized a discretion in the trial judge to refuse to hear a pendent state claim after dismissal of the federal claim if judicial economy would not be served by hearing the state claim. The Court in *Gibbs* broadened the discretion to refuse to hear the pendent claim. The trial court, it said, should look to 'considerations of judicial economy, convenience and fairness to litigants' in exercising its discretion, and should avoid needless decisions of state law. It ap-

peared to require dismissal of the state claim if the federal claim, though substantial enough to confer jurisdiction, were dismissed before trial. Even if this were not the case, the state claim should be dismissed without prejudice if the state issues substantially predominate, or if the possibility of jury confusion would justify separating the state and federal claims for trial. The argument is stronger for retaining the state claim if it is closely tied to questions of federal policy, as was true in *Gibbs* itself where the scope of the state claim was limited by the federal doctrine of preemption. The question of power to hear the pendent claim, the Court said, should ordinarily be resolved on the pleadings, but the discretion whether to dismiss the state claim exists throughout the case." Wright, *Law of Federal Courts*, § 19 (1970).

question posed indicates that the counterclaim is compulsory. It points out also the inexactitude and weaknesses of these criteria.

The defendant's counterclaim can not measure up to any of the four standards.

Obviously the issues of fact and law raised by the claim and counterclaim are not "largely the same." They are entirely different. Plaintiff's claim is uniquely discrete, factually and legally. The only factual inquiry is whether the defendant made a proper disclosure of the terms of the credit sale. The only law involved is the Truth in Lending Act and the regulations thereunder. The counterclaim raises questions of fact as to payments and whether after repossession the seller in conducting the foreclosure sale sufficiently followed the requirements of Ga.Code Ann. § 96–909 as to entitle it to a deficiency judgment, and legally involves state laws relating to installment sales, repossessions, foreclosures, and deficiency judgments.

*Wright and Miller, supra* is particularly critical of the second test, describing it as "inadequate as an overall standard" and stating that the doctrine applied by most courts seems to be the converse and that "absent a compulsory counterclaim rule, a pleader is never barred by res judicata from suing independently on a claim that he refrained from pleading as a counterclaim in a prior action." § 1410. The doctrine of "res judicata" will not bar defendant from asserting its counterclaim against the plaintiff in a later state court suit. *See Agostine v. Sidcon Corp.*, 69 F.R.D. 437 (E.D.Pa. 1975).

The evidence as to plaintiff's claim and the defendant's counterclaim has been heard and is entirely different. It at no place overlaps.

Nor is there any "logical relation" between the claim and the counterclaim. This is the most widely used test. *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631 (3rd Cir. 1961); *Agostine v. Sidcon Corp., supra; Wright and Miller, supra*, § 1410 at p. 48. In *Great Lakes*, the court said: ". . . [A] counterclaim is com-

pulsory if it bears a 'logical relationship' to an opposing party's claim. . . . Where multiple claims . . . are offshoots of the same basic controversy between the parties, fairness and considerations of convenience and of economy require that the counterclaimant be permitted to maintain his cause of action." In applying that principle to a later truth in lending case, Judge Teitelbaum in *Zeltzer v. Carte Blanche Corp.*, 414 F.Supp. 1221, 1223 (W.D.Pa. June 24, 1976) said: "On a purely transactional level, such a [logical] relationship obviously exists: both claim and counterclaim arise out of a singular occurrence . . . . But in these circumstances, I do not consider the presence of transactional identity alone sufficient to establish, for compulsory counterclaim purposes, a logical relationship between plaintiff's claim and defendant's counterclaim. . . . I find that the respective claims are 'offshoots' of the same basic transaction, but not the 'same basic controversy between the parties' . . ." So separate are these two claims that as Judge Rubin pointed out in *Jones v. Goodyear Tire & Rubber Co.*, 73 F.R.D. 577, 580 (E.D.La. Dec. 23, 1976) the plaintiff is not entitled to a jury trial while the defendant could have demanded jury trial of the counterclaim, and as Judge Edenfield remarked in *Roberts v. National School of Radio & Television Broadcasting*, 374 F.Supp. 1266, 1271 (N.D.Ga. April 25, 1974) a plaintiff suing under truth in lending would probably be entitled to a separate trial not involving the counterclaim so as to avoid prejudice to him.

To be sure, there are some decisions which reach a contrary conclusion. Among them are *Rollins v. Sears, Roebuck & Co.*, 71 F.R.D. 540 (E.D.La. June 21, 1976); *Mims v. Dixie Finance Corp.*, 426 F.Supp. 627 (N.D.Ga. May 6, 1976); *Gibson v. Family Finance Corp.*, 404 F.Supp. 896 (E.D.La. Sept. 5, 1975). While we have not counted cases, we note that the view here espoused was referred to as the "majority view" in *Gammons v. Domestic Loans of Winston-Salem, Inc.*, 423 F.Supp. 819, 821 (M.D.N.C. Dec. 8, 1976).

The leading case expressing the views echoed in this memorandum is *Roberts v. National School of Radio & Television Broadcasting, supra.* The well-reasoned opinion of Judge Edenfield in that case has been commended in several subsequent cases. Oddly enough, in *Mims, supra,* the United States District Court for the Northern District of Georgia, en banc, approved and adopted the recommendation of a special master that these counterclaims in this type case be considered compulsory, thereby overruling *Roberts, supra.* It so happens, however, that since Mims, four reported decisions have refused to follow it, following the rationale of *Roberts* instead. These cases are *Zeltzer v. Carte Blanche Corp., supra; Gammons v. Domestic Loans of Winston-Salem, Inc., supra; Jones v. Goodyear Tire & Rubber Co., supra* ; and *Parr v. Thorp Credit, Inc.,* 73 F.R.D. 127 (S.D.Iowa January 14, 1977).

In *Roberts,* Judge Edenfield wrote:

Given the remedial nature of TIL and the broad public policy which it serves, federal courts should be loath to become immersed in the debt collection suits of the target of the very legislation under which a TIL plaintiff states a cause of action. . . . To permit the defendant to pursue its [counter]claim in federal court would unduly complicate the expeditious resolution of TIL litigation. . . . To permit the defendant in a TIL action to utilize the proceedings merely as a forum to state grievances against a debtor-plaintiff would be an incongruous result and clearly prejudicial to the plaintiff's claim. Moreover, it would involve the

court in questions of absolutely no federal significance.

The Special Master's report in *Mims* is published with the opinion, 426 F.Supp. at page 629. Its operative paragraph reads:

[1] This court is virtually compelled to hold that the counterclaim is compulsory under traditional tests. See, *Spartan Grain & Mill Co. v. Ayers,* 517 F.2d 214 (5th Cir. 1975). In that case, the Fifth Circuit obviously perceived the claim and the counterclaim to arise out of the same transaction. Superfluously, this Special Master notes that he shares in that perception.

We think the Special Master's reliance upon *Spartan Grain and Mill Co. v. Ayers* is misplaced. In the *Spartan* case, the plaintiff sued to collect for chicken feed. The holding was that the trial court should have allowed defendants to amend their pleadings to allege violations by plaintiff of the TIL Act and violations by plaintiff of the Georgia usury statutes, Ga.Code Ann. § 57–101 et seq. It seems clear that the counterclaim for usury was compulsory. *See John R. Alley & Co. v. Federal National Bank,* 124 F.2d 995 (10th Cir. 1942). There was no necessity for the court of appeals in *Spartan* to consider whether the TIL aspect of the counterclaim was compulsory and from the opinion, it cannot be discerned that it was considered. So we can say, as Judge Rubin did in *Jones v. Goodyear, supra* : "This . . . issue . . . [has] never yet [been] definitely decided by an appellate court." [3]

In *Zeltzer, supra,* 414 F.Supp. at p. 1225, Judge Teitelbaum said:

---

**3.** The Court of Appeals of Georgia, in determining whether a TIL counterclaim was barred by the statute of limitations or would be considered as in the nature of recoupment and therefore timely, well stated the relationship between TIL claims and other claims arising out of the same transaction as follows:

"The Truth-in-Lending counterclaim sub judice did not arise out of the mutual obligations or covenants of the loan transaction upon which this suit was founded but is independent thereof. Although the claim arose contemporaneously with the execution of the contract, it is not a product of a breach of any obligation or covenant therein; nor is it related either to the

subject matter of the contract or the plaintiff's suit. On the contrary, the borrowers' claim for recovery of a penalty created by federal law is an extrinsic by-product of this transaction and is not dependent upon the lender's contractual obligations. It has no relationship to an infringement of the mutual obligations and stipulations of the transaction. In short, it is . . . an affirmative action which demands a penalty for an independent wrong." *Hodges v. Community Loan & Investment Corp. of North Georgia,* 133 Ga.App. 336, 344, 210 S.E.2d 826, 832 (1974), *aff'd in part, rev'd in part on other grounds,* 234 Ga. 427, 216 S.E.2d 274 (1975).

In my judgment, the district court's decision in *Mims* . . . is unfortunate, and, if accepted, would operate to open the federal courts to a flood-tide of debt collection counterclaims involving "questions of no federal significance." Such claims are controlled entirely by state law, and the state should have the right to determine them without federal intervention. In my view, the *Mims* decision opts for a modicum of real or imagined convenience at the expense of the important principle of limited federal jurisdiction. In an era appreciative of the salutary effects of limited federal judicial and governmental intrusion into state affairs, *Mims* endorses the broad exercise of federal jurisdiction, and thus federal power, solely to gain what amounts to little more than adjudicatory tidiness. I believe that this is a mistake, and therefore decline to follow that case.

In *Gammons, supra,* the court lists a number of decisions supporting its conclusion that the "majority view" is expressed by *Roberts* and not by *Mims.*

In *Jones v. Goodyear, supra,* Judge Rubin points out that since a TIL plaintiff is not entitled to a jury trial, while the counterclaiming defendant might demand one, "[t]his would not only retard the litigation it would bifurcate decision. It would transform a case likely resolvable on summary judgment motion into a full fledged trial of only tangentially related factual matters."

In *Parr v. Thorp Credit, Inc., supra,* Chief Judge Hanson seems to concur in the classification of *Mims* as "unfortunate" and cites with approval Judge Edenfield's decision in *Roberts.*

Having carefully considered all of these authorities, this court is of the view that defendant's counterclaim is permissive only and must be dismissed for lack of jurisdiction. Accordingly, an order will be entered dismissing plaintiff's complaint for lack of merit and with prejudice, and dismissing defendant's counterclaim for lack of jurisdiction and without prejudice. This memorandum opinion is intended to suffice as findings of fact and conclusions of law.