Jeffrey M. PAULL, on behalf of himself and all others similarly situated, Plaintiffs,

v.

CHRYSLER CREDIT CORPORATION and Fireside Chrysler-Plymouth, Inc., Defendants.

No. 81 C 5871.

United States District Court, N. D. Illinois, E. D.

Aug. 17, 1982.

Paul W. Grauer, Schaumburg, Ill., for plaintiffs.

Gilbert W. Gordon, Alan I. Becker, Clyde O. Bowles, Karen E. Taylor, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Jeffrey M. Paull ("Paull") brought this action on behalf of himself and others similarly situated alleging that defendants Fireside Chrysler-Plymouth, Inc. ("Fireside") and Chrysler Credit Corporation ("Chrysler") violated the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1631 and 1638, and Regulation Z promulgated thereunder,[1] by failing to properly disclose certain items in a retail installment contract Paull signed in connection with his purchase of a 1981 Mazda RX–7 from Fireside. This matter is presently before the Court on the motions of Fireside and Chrysler for summary judgment in their favor under Fed.R.Civ.P. 56.[2]

The material facts in this case are not in dispute. Paull purchased the Mazda from Fireside under a "Retail Installment Contract" dated October 21, 1980. See Plaintiff's Exhibit "A". This document also served as the disclosure statement required under TILA. The evidence in the record discloses that Paull offered his used car, a Fiat appraised at $8,600, in trade on the Mazda, but that Fireside agreed to give Paull a trade-in allowance of $10,850 which was $2,250 more than the Fiat was worth. Paull owned the Fiat subject to a loan with a balance due of $9,004.87, however, so that, at least on paper, his net trade-in was $1,845.13 (trade-in allowance minus balance owed). To offset the resultant $2,250

---

1. See Scully, The New Truth In Lending Act: An Overview, 70 Ill.B.J. 752 (1982), for a good discussion of the application of the TILA and Regulation Z.

2. In an earlier opinion, this Court denied Fireside's motion to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). At that time, we suggested that Fireside might wish to move for summary judgment after conducting some discovery with reference to the allegations in Paull's complaint. Fireside has done so, joined by defendant Chrysler. Also before the Court are the motions of both defendants to strike the class allegations in Paull's complaint and Chrysler's petition for attorneys' fees.

"gain" to Paull, Fireside raised the price on the Mazda by $2,250. Therefore, although the Mazda carried a sticker price of $10,869, after Fireside's adjustment, Paull agreed to purchase the Mazda for over $13,000. In addition to his trade-in, Paull made a downpayment, in the amount of $590, of which $290 was paid in cash with the balance paid six days later, pursuant to a personal note executed by Paull.

The complaint alleges that the numerical amounts listed in the spaces on the disclosure statement labelled "cash price," "cash downpayment" and "trade-in" are not the "actual true amounts" of the transaction. Paull bases his claim for relief on Regulation Z, §§ 226.8(c)(1) and (2), which provides in relevant part:

> In the case of a credit sale . . . the following items . . . shall be disclosed:
> (1) The cash price of the property or service purchased, using the term "cash price."
> (2) The amount of the downpayment itemized, as applicable, as downpayment in money, using the term "cash downpayment," downpayment in property, using the term "trade-in" and the sum, using the term "total downpayment." Regulation Z § 226.8(c).

The disclosure form given to Paull discloses amounts for each required term. But the amount listed as "cash price" and "trade-in" reflect only the final bargain and do not separately disclose the $2,250 adjustments or any other aspect of the negotiations. The amount listed as "cash downpayment" does not separately disclose that Paull deferred a portion of his downpayment. The above facts being undisputed, the Court must consider whether the disclosures made satisfy the TILA.

The broad purpose of the Truth in Lending Act is to promote the informed use of credit by assuring "meaningful disclosure of credit terms" to consumers. 15 U.S.C. § 1601. To implement this purpose, Congress delegated expansive authority to the Federal Reserve Board, 15 U.S.C. § 1604, which promulgated specific disclosure requirements governing credit transactions under the TILA. See Regulation Z, 12 C.F.R. Part 226 (1979). Credit disclosures which fall short of the clearly expressed requirements of Regulation Z constitute violations of the TILA. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). Conversely, creditors who comply with a "rule, regulation, or interpretation" of the Federal Reserve Board are entitled to a good faith defense to TILA claims. 15 U.S.C. § 1640(f). When the Act and Regulation Z are silent, TILA claims are weighed against the primary requirement of "meaningful disclosure." Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980). The Supreme Court has explained that judges must "temper judicial creativity in the face of legislative or regulatory silence." Milhollin, supra at 565, 100 S.Ct. at 796. Moreover, the Court in Milhollin emphasized that:

> the concept of "meaningful disclosure" that animates TILA . . . cannot be applied in the abstract. Meaningful disclosure does not mean more disclosure. Rather, it describes a balance between "competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload]."

444 U.S. at 568, 100 S.Ct. at 798. (Emphasis in original), (Citations omitted). Accord, Ford Motor Credit Co. v. Cenance, 452 U.S. 155, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1981) (per curiam). Thus, under the TILA, creditors may be liable to their credit customers for disclosures that do not meet the express statutory or regulatory requirements, or for disclosures which do not further the TILA's main concern with meaningful disclosure. Yet, courts should be cognizant that "meaningful" disclosure does not necessarily mean "more" disclosure, particularly when the credit customer would not benefit materially from additional disclosure requirements. Under this standard, we address defendants' motions as to each of Paull's claims.

*"Cash Price"*

Paull's claim that the defendants did not disclose the "actual true amount" of cash price, is most readily construed as a con-

tract dispute. The Retail Installment Contract signed by Paull lists "cash price" as $13,145.87. Paull suggests that two other different amounts represent the actual bargained-for price. But the TILA is not intended as a vehicle for pursuing contract claims. Moreover, if Paull is only challenging the terms of the bargain, his contrary assertions are barred by the parol evidence rule.[3] *See, e.g., Anthony v. Community Loan & Investment Corp.,* 559 F.2d 1363, 1369 (5th Cir. 1977); *Meadows v. Charlie Wood, Inc.,* 448 F.Supp. 717, 720 (M.D.Ga. 1978).

Paull nakedly asserts, however, that his claim regarding "cash price" is based on the TILA, not contract law. In fact, the term "cash price" has a technical meaning for purposes of the TILA.[4] Under Regulation Z, certain charges are properly included in "cash price," but finance charges are not. *See, e.g., Joseph v. Norman's Health Club, Inc.,* 386 F.Supp. 780 (E.D.Mo.1975). In the present case, however, Paull has neither alleged nor produced any evidence that the defendants included finance charges or hidden costs of credit within the amount disclosed as "cash price." Thus, the Court finds no basis in the record to draw any reasonable inferences that the defendants violated the express statutory or regulatory requirements for the disclosure of the term "cash price."

The Court also concludes that the record is incapable of supporting an inference that the defendants deprived Paull of meaningful disclosure. Although the party opposing a motion for summary judgment is entitled to all reasonable inferences that can be made in its favor from the evidence in the record, *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Moutoux v. Gulling Auto Electric,* 295 F.2d 573, 576 (7th Cir. 1961), when the moving party has clearly established facts that defeat the opposing party's claim, the opposing party may have a duty to go forward with controverting facts. *Patterson v. General Motors Corp.,* 631 F.2d 476, 483 (7th Cir. 1980). In this case, Fireside has explained that it adjusted cash price and trade-in allowance upward $2,250 during the bargaining process preceding Paull's acceptance of the purchase contract. Paull does not dispute Fireside's explanation.[5] More importantly, Paull has produced no facts tending to show how requiring more disclosure would meaningfully benefit him.

Accordingly, the Court finds that "cash price" was properly disclosed.

*"Cash Downpayment"*

The issue is whether the TILA requires separate disclosure of the deferred portion of Paull's downpayment. The Federal Reserve Board has indicated that a

---

3. The Court notes, though, that the parol evidence rule is not a defense merely because the TILA disclosures were made on the written contract signed by the consumer. The consumer's signature does not insulate creditors from the TILA. Yet, to the extent that Paull's claim may be read as a contract claim challenging the bargain, the parol evidence rule would apply.

4. Regulation Z § 226.2(i) provides:

"Cash price" means the price at which the creditor offers, in the ordinary course of business to sell for cash the property or services which are the subject of a consumer credit transaction. It may include the cash price of accessories or services related to the sale such as delivery, installation, alterations, modifications, and improvements, and may include taxes to the extent imposed on the cash sale, but shall not include any [finance charges].

Paull's argument that cash price should be disclosed without including sales tax is easily rejected based on the above definition. Cash price may include sales tax. *See English v. MCC Financial Services, Inc.,* 403 F.Supp. 679, 683 (M.D.Ga.1975); FRB Advisory Letter No. 900, CCH Couns.Cred. Guide ¶ 31,234 (June 19, 1975).

5. Instead, Paull suggests that the purpose of Fireside's adjustments was to create a substantial "fake" downpayment towards the new car sold to him at a price inflated above its value. In fact, Paull financed virtually the entire pre-adjusted price of the new car. The obvious problem with this procedure is that the lender, in this case Chrysler, is deprived of the security interest of the purchaser's equity. Yet, this problem is of no moment towards the question before the Court: whether Paull, the consumer, was deprived of the protections of the TILA.

deferred downpayment may be "treated" as part of the downpayment (and termed a "pick up payment") if it is not subject to a finance charge, is payable not later than the due date of the second regular payment and is not greater than twice the amount of the regular installment payment. Regulation Z § 226.504. *See also* Revised Regulation Z § 226.2(a)(18). At the time of Paull's purchase, it was uncertain whether or not the Board meant that deferred downpayments which could be "treated" as part of the downpayment should be separately disclosed. But the Board's official commentary to Revised Regulation Z [6] states that deferred downpayments which meet the definition of a pick-up payment are

> subtracted [from cash price] in arriving at the amount financed ... [and] ... may, but need not, be reflected in the payment schedule.... 46 F.R. 50294 (Oct. 9, 1981).

Paull's deferred downpayment is indeed within the definition of a pick-up payment. Regulation Z § 226.504. The Board's commentary makes it clear that separate disclosure is optional.

Conceivably, in an exceptional case, the Board might consider separate disclosure necessary to provide meaningful disclosure. Yet Paull has introduced no facts, nor raised any issues to persuade the Court that the separate disclosure he demands would meaningfully benefit him or other consumers. Instead he relies solely on *Gilbert v. Wood Acceptance Co.*, 486 F.2d 627 (7th Cir. 1973), in which the Seventh Circuit held that despite the lack of a statutory or regulatory requirement, a creditor's failure to separately disclose a deferred downpayment violated the TILA because the retail installment contract did not disclose in full the terms of the transaction. *Id.* at 631. Factually, *Gilbert* is directly on point with the instant case. Subsequent to *Gilbert*, however, the Supreme Court explained in *Milhollin* and *Cenance, supra*, that disclosure

need not list every term of a transaction in order to be *meaningful* under the TILA. Rather, meaningful disclosure represents a balance between complete disclosure and informational overload. *Cenance*, 452 U.S. at 159, 101 S.Ct. at 2241; *Milhollin*, 444 U.S. at 568, 100 S.Ct. at 798. There is no indication in the instant record that separate disclosure of the deferred downpayment would meaningfully benefit the consumer. Accordingly, in light of Supreme Court pronouncements subsequent to *Gilbert*, we hold that "cash downpayment" was properly disclosed.

*"Trade-in"*

▇ Paull contends that "trade-in" was improperly disclosed for two reasons. First, the disclosure form only listed an amount corresponding to net trade-in rather than trade-in allowance. Second, Fireside boosted trade-in by the $2,250 amount.

The Court finds, however, that neither of the reasons urged by Paull make out a TILA violation. First disclosure of net trade-in where the consumer has debts outstanding on his trade-in property is consistent with the arithmetic structure of Regulation Z § 226.8(c). This section calls for disclosure of total downpayment, including trade-in, as the amount available to reduce cash price to arrive at unpaid balance. *See also* Revised Regulation Z § 226.2(a)(18). Only the net trade-in is available to reduce cash price, hence, disclosure of net trade-in is proper. Second, nothing in the present record indicates that defendants violated the TILA by adjusting trade-in allowance and cash price upward by $2,250. As with "cash price," Paull's assertions here may be barred by the parol evidence rule. From the standpoint of the TILA, however, the Court has found no statutory or regulatory provision that clearly requires more disclosure here, nor has Paull in any way shown that more disclosure would meaningfully benefit him or other consumers.

---

**6.** We note that Revised Regulation Z is relevant here, though not necessarily controlling since it

post-dates the challenged transaction. *See An-*

For the reasons above, the Court grants summary judgment for the defendants as to each of plaintiff's claims.[7]  It is so ordered.[8]

derson Brothers Ford v. Valencia, 452 U.S. 205, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981).

7.  In granting summary judgment for defendants as to each of Paull's claims of substantive TILA violations, the Court has no occasion to consider whether Chrysler would be jointly responsible to Paull as alleged.  In light of our substantive rulings, Chrysler's separate ground for summary judgment is rendered moot.

Further, the Court notes that Paull originally filed his suit as a class action.  Although Fed.R. Civ.Pro. 23(a) requires a class representative to move for class certification as early as practicable, Paull never so moved.  Coupled with the above judgment against him on the merits, the Court finds Paull a wholly inadequate class representative, and grants defendants' motion to strike the class allegations.

8.  Chrysler has petitioned for attorney's fees in the amount of $90.00 occasioned by plaintiff's failure to adhere to the briefing schedule initially set by this Court and the two court appearances necessary to resolve the matter.  Plaintiff may respond thereto if he so chooses within 7 days from the date of this opinion.  In the event he does not so respond, the petition shall be granted.