Christina SLOVER–BECKER, Plaintiff,

v.

PITRE CHRYSLER PLYMOUTH JEEP OF SCOTTSDALE, INC., Defendant.

No. CIV04–1736PHX–JWS.

United States District Court, D. Arizona.

Nov. 9, 2005.

Marshall Scott Meyers, Krohn & Moss Ltd., Phoenix, AZ, for Plaintiff.

Tina Marie Ezzell, Sacks Tierney PA, Scottsdale, AZ, for Defendant.

## OPINION AND ORDER

**[Re: Motions at Docket 32 and 36]**

SEDWICK, District Judge.

### I.  MOTIONS PRESENTED

At docket 32 defendant Pitre Chrysler Plymouth Jeep of Scottsdale, Inc. ("Pitre") has moved for summary judgment. At docket 36 plaintiff Christina Slover–Becker ("Becker") has opposed Pitre's motion and cross-moved for summary judgment. The matter has been fully briefed. Neither party has requested oral argument, and it would not assist the court.

### II.  BACKGROUND/FACTS

This action arises out of Becker's purchase of a 2000 Mercedes–Benz ML320 from Pitre under a Retail Installment Sales Contract ("RISC") in October 2003. The essential facts underlying the transaction are undisputed. In exchange for the Mercedes, Becker traded in a 2001 Jeep Grand Cherokee on which she still owed $27,300, paid $4,400 in cash, and financed the balance of $26,197.41. Pitre paid off the balance due on the Jeep as part of the transaction. Summarized, the Itemization of Amount Financed section of the RISC provides:

| | |
|---|---|
| Cash Sales Price: | $30,957.41 |
| Trade-in $27300.00 (-) Payoff $27300.00 = Net–Trade–In | N/A |
| Cash Down Payment | $ 4,400.00 |
| Unpaid Balance of Cash Sale Price | $26,197.41 |

In her complaint, Becker alleges that the value of the Jeep Cherokee was overstated by $10,800,[1] which was "rolled into" and increased the cash price of the Mercedes ML 320 and, in so doing, Pitre failed to disclose that it had rolled the $10,800 negative equity from the Jeep Cherokee into the amount financed.

### III.  ISSUE PRESENTED

This case presents a narrow issue of law:  does the Truth In Lending Act

---

**1.** Becker offers the only evidence as to the actual cash value of the Jeep Cherokee as being $16,500. Pitre has not objected to the evidence offered by Becker and has not produced any evidence of the actual cash value of the Jeep Cherokee. Consequently, for the purpose of ruling on these motions, the court accepts $16,500 as the actual cash value of the Jeep Cherokee.

("TILA")[2] and its implementing regulation, "Regulation Z" promulgated by the Federal Reserve Board,[3] require the amount of the "negative equity" in a vehicle traded in on another vehicle to be clearly and separately disclosed?

## IV. STANDARD

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the moving party is entitled to judgment in its favor as a matter of law.[4] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."[5] In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing there is a genuine issue for trial.[6] The issue of material fact necessary to entitle a party to a trial is not required to be resolved conclusively in favor of the party asserting the fact; all that is needed is sufficient supporting evidence to require a fact-finder to resolve the parties' differing versions of the truth at trial. There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.[7]

## V. DISCUSSION

Becker's position is that in showing the amount of the trade-in allowance as being equal to the balance that she owed on the vehicle instead of its actual cash value and "balancing" the transaction by adding the negative equity to the cash price, Pitre failed to disclose that $10,800 of the amount financed was in reality refinancing of the negative equity in the Jeep, not part of the purchase price of the Mercedes. Relying on a recent decision of a California Court of Appeal, *Thompson v. 10,000 RV Sales, Inc.,*[8] Becker argues that this violated TILA and Regulation Z. Pitre, relying on a 20–year–old Seventh Circuit decision, *Paull v. Chrysler Credit Corp.,*[9] argues that it does not. Neither *Thompson* nor *Paull* is controlling, and the court has not found any controlling decision of either the U.S. Supreme Court or the Ninth Circuit.

Analysis of the provision of TILA and Regulation Z starts with the basic rules upon which application of TILA is based. Congress has stated, with respect to the purpose of TILA:[10]

It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate

**2.** 15 U.S.C. §§ 1601, *et seq.*

**3.** 12 C.F.R. PART 226.

**4.** FED. R. CIV. P. 56(c); *Lopez v. Smith,* 203 F.3d 1122, 1131 (9th Cir.2000) (*en banc*); *Taylor v. List,* 880 F.2d 1040, 1044 (9th Cir. 1989).

**5.** *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**6.** FED. R. CIV. P. 56(e); *Henderson v. City of Simi Valley,* 305 F.3d 1052, 1055–56 (9th Cir.2002).

**7.** *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**8.** 130 Cal.App.4th 950, 31 Cal.Rptr.3d 18 (2005).

**9.** 705 F.2d 944 (7th Cir.1983) (adopting the opinion of the district court at 544 F.Supp. 848 (N.D.Ill.E.D.1982)).

**10.** 15 U.S.C. § 1601(a).

and unfair credit billing and credit card practices.

The Supreme Court has cautioned that the concept of "meaningful disclosure" cannot be applied in the abstract. It does not necessarily mean more disclosure; rather, it describes a balance between competing considerations of complete disclosure and the need to avoid informational overload.[11]

Becker argues that Pitre's method of accounting for the negative equity runs afoul of § 1638(a)(2) (establishing the disclosure requirements for other than open end credit plans) and §§ 226.2(a)(9) (defining "cash price"), 226.2(a)(18) (defining "downpayment"), and 226.4 (defining "finance charge") of Regulation Z. The Federal Reserve Board, pursuant to specific authority granted it by Congress,[12] adopted Regulation Z implementing TILA. Unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to TILA, the court is bound by these regulations.[13] Neither "cash price" nor "downpayment" are defined by TILA; consequently, as Becker correctly argues, the definitions adopted in Regulation Z bind the court. Although TILA itself defines finance charges,[14] the U.S. Supreme Court has held that courts are bound by the Federal Reserve's definition in 12 C.F.R. 226.4.[15] Becker also relies in part on the interpretations of Regulation Z contained in Supplement I to Part 226— Official Staff Interpretations ("Staff Interpretation"). Unless plainly irrational, erroneous or at odds with the regulations, Federal Reserve Board staff interpretations construing TILA or Regulation Z should be dispositive.[16]

While TILA is generally construed as a remedial statute, interpreted liberally in favor of the consumer,[17] Congress has provided a good-faith defense to creditors who comply with the Board's rules and regulations or who conform to any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals.[18]

Addressing first whether the downpayment was properly disclosed. Regulation Z defines down payment as:[19]

*Downpayment* means an amount, including the value of any property used as a trade-in, paid to a seller to reduce the cash price of goods or services purchased in a credit sale transaction. A deferred portion of a downpayment may be treated as part of the downpayment if it is payable not later than the due date of the second otherwise regularly scheduled payment and is not subject to a finance charge.

In the case at bar, Pitre reported no value for the trade-in and a cash downpayment of $4,400. The Staff Interpretation provides that where the trade-in has a negative value and a cash downpayment is

---

**11.** *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980).

**12.** 15 U.S.C. § 1604(a).

**13.** *Household Credit Services, Inc. v. Pfennig,* 541 U.S. 232, 242, 124 S.Ct. 1741, 158 L.Ed.2d 450 (2004).

**14.** 15 U.S.C. § 1605(a).

**15.** *Household Credit Services, Inc. v. Pfennig, supra.*

**16.** *Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at 565–68, 100 S.Ct. 790.

**17.** *King v. State of California,* 784 F.2d 910, 915 (9th Cir.1986).

**18.** 15 U.S.C. § 1640(f); *Household Credit Services, Inc. v. Pfennig, supra,* 541 U.S. at 238, 124 S.Ct. 1741; *Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at 566–67, 100 S.Ct. 790.

**19.** 12 C.F.R. § 226.2(a)(18) (2003).

made, "creditors may, at their option, disclose the entire cash payment as the downpayment, or apply the cash payment first to any excess lien amount and disclose any remaining cash as the downpayment."[20] In this case, Pitre chose not to use the cash downpayment to reduce the excess lien amount but to show the entire cash downpayment as a downpayment. In that case, the amount of the deficit must be reflected as an additional amount financed.[21] It is undisputed that the negative equity in the Jeep Cherokee is included in the amount financed.

Although somewhat difficult to follow, Becker argues that Pitre's failure to show a negative number as the total downpayment violates on its face the Regulation Z definition. The argument is incorrect, and even specious given Becker's acknowledgment that Pitre could not disclose a negative number under the Staff Interpretation that Becker contends is controlling. Becker further argues that the negative equity is a deferred downpayment that must be paid not later than the second otherwise regularly scheduled payment. This argument is also incorrect. As Becker acknowledges, Pitre did not treat the equity deficit as part of the downpayment, it included the deficit in the amount financed. The manner in which Pitre disclosed the trade-in as having no net value and the full amount of the cash as the downpayment not only did not violate TILA or Regulation Z but was entirely consistent with the Staff Interpretation, which precludes showing a negative downpayment and permits the full amount of the cash to be shown as the downpayment.

Next, the court addresses the issue of whether the "cash price" was incorrectly stated. "Cash price" is defined in Regulation Z as:[22]

*Cash price* means the price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration. The term does not include any finance charge.

The Staff Interpretation further refines this definition in the following terms:[23]

1. *Components.* This amount is a starting point in computing the amount financed and the total sale price under § 226.18 for credit sales. Any charges imposed equally in cash and credit transactions may be included in the cash price, or they may be treated as other amounts financed under § 226.18(b)(2).

Becker argues somewhat obliquely that the negative equity Pitre "rolled into" the sales price was a finance charge. Finance charge is defined, in relevant part as:[24]

(a) *Definition.* The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

(1) *Charges by third parties.* The finance charge includes fees and amounts

---

20. 12 C.F.R. Pt. 226, Supp. I, Comment 2(a)(18).3.ii (2003). The court notes that Becker incorrectly cited and argued Comment 2(a)(18).3.i, applicable where there is no cash downpayment.

21. *Id.*

22. 12 C.F.R. § 226.2(a)(9) (2003).

23. 12 C.F.R. Pt. 226, Supp. I, Comment 2(a)(9) (2003).

24. 12 C.F.R. § 226.4 (2003); *see also* 15 U.S.C. § 1605(a) (similar definition).

charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

(I) requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or

(ii) retains a portion of the third party charge, to the extent of the portion retained.

\*    \*    \*    \*    \*    \*

Both Regulation Z and TILA contain examples of what constitutes a finance charge, none of which fit the negative equity situation presented in this case. A finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit, but does not include any charge of a type payable in a comparable cash transaction.[25]

The negative equity in this case does not fall within the definition of a finance charge. There was no difference in the amount Becker, or anyone else in a comparable transaction, would be required to pay Pitre for the Mercedes—$30,597.41— whether the transaction was for cash or financed. The increase in the sales price was not a product of the fact that Becker

was buying the Mercedes on credit, *i.e.*, she was being charged more for buying on credit, it was the result of the negative equity in the Jeep Cherokee. It cannot, therefore, be said that the "charge" was "incident to or a condition of an extension of credit."[26]

While the court may agree it would have been better and, perhaps, more enlightening to Becker in the context of the overall transaction had Pitre specifically disclosed the amount of the negative equity, nothing in TILA or Regulation Z mandates such a disclosure with respect to the financing aspect.[27] The cash price was clearly inflated; however, as noted above, the Staff Interpretation permits a creditor to include charges that are equally imposed in cash and credit transactions to be included in the cash price.[28] This interpretation insulates Pitre from violating TILA and Regulation Z. The Supreme Court has made clear that courts "must temper judicial creativity in the face of legislative or regulatory silence."[29] If a change is to be made in the mandatory disclosure requirements of TILA, it is for Congress or the Federal Reserve Board to make it.

TILA addresses defects in disclosures related to obtaining credit; it does not address shortcomings in disclosures related to other aspects of a contract.[30] The bottom line is that Becker agreed to ex-

---

25. *See Virachack v. University Ford,* 259 F.Supp.2d 1089, 1092–93 (S.D.Cal.2003), *aff'd,* 410 F.3d 579 (9th Cir.2005).

26. *See Virachack v. University Ford,* 410 F.3d 579, 582 (9th Cir.2005).

27. In reaching this conclusion, the court disagrees with the implication by the California Court of Appeal in *Thompson* that it must be "clearly and separately disclosed in the 'itemization of amount financed' " [31 Cal.Rptr.3d at 36]. 12 C.F.R. Pt 226, Supp. I, Comment

18(c).2.(iii) (2003) uses the permissive "may," making the disclosure optional, not mandatory.

28. 12 C.F.R. Pt. 226, Supp. I, Comment 2(a)(9) (2003).

29. *Ford Motor Credit Co. v. Milhollin, supra,* 444 U.S. at 565, 100 S.Ct. 790.

30. *Paull v. Chrysler Credit Corp., supra,* 544 F.Supp. at 851; *see also* 15 U.S.C. § 1601(a).

change her Jeep Cherokee plus $30,597.41 for the Mercedes ML 320 and the assumption (or payment) by Pitre of $10,800 in negative equity in the Jeep Cherokee. Becker agreed to pay the purchase price by $4,400 in cash and finance the $26,197.41 balance. While the RISC in this case may not have disclosed all the details of the contract between the parties, it did disclose that which TILA requires: the cost of the credit transaction. It is undisputed that Pitre fully disclosed the APR, finance charge, amount financed, and the total sale price as required by TILA.

Becker contends that Pitre could have avoided a TILA violation by providing a "written itemization of the amount financed including each amount that is or will be paid on the consumer's behalf together with an identification of or reference to the third person."[31] Pitre did that. The RISC clearly showed a payoff amount on the Jeep Cherokee of $27,300. Although Pitre did not specifically identify the person to whom the payoff was made, which was, perhaps, a technical violation,[32] the creditor was well known to Becker, so disclosure would not have materially helped her to understand the credit terms or cost of obtaining credit or served the purposes of TILA.[33]

## VI. CONCLUSION

For the reasons set forth above, the motion of Pitre Chrysler Plymouth Jeep of Scottsdale, Inc. at docket 32 is **GRANTED**, and the cross-motion of Christina Slover–Becker at docket 36 is **DENIED**.

The Clerk will please enter judgment that plaintiff take nothing from defendant and that defendant recover its costs from plaintiff.

---

**31.** Citing 15 U.S.C. § 1638(b)(2)(B)(ii).

**32.** *See* 12 C.F.R. § 226.18(c)(1)(iii).

**33.** 15 U.S.C. § 1601(a); *Cf. Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 159, 101 S.Ct. 2239, 68 L.Ed.2d 744 (1981) (per curiam).