**Ralph and Rubye PULLEY, Appellants,**

v.

**Keith MILBERGER, Appellee.**

No. 05–05–00891–CV.

Court of Appeals of Texas, Dallas.

July 24, 2006.

Robert H. Osburn, Dallas, for Appellant.

W. Mark Montgomery, George Parker & Associates, McKinney, for Appellee.

Before Justices RICHTER, LANG, and MAZZANT.

## OPINION

Opinion by Justice LANG.

Ralph and Rubye Pulley appeal the trial court's take-nothing judgment against them in their lawsuit to recover their security deposit and in favor of their landlord, Keith Milberger, on his counterclaim for damages incurred in repairing the property. The Pulleys raise seven issues on appeal.

In issues two through four, the Pulleys argue the trial court erred when it rendered a take-nothing judgment against them and a judgment in favor of Milberger for damages because Milberger failed to plead: (1) the absence of bad faith to

refund their security deposit or give them a written itemization of the charges for repairs; (2) the charges he offset against the security deposit were reasonable as required by the lease and section 92.109 of the Texas Property Code; and (3) he had a reasonable excuse for his failure to refund the security deposit or give them a written itemization of the charges for repairs.

In issues one and five through seven, the Pulleys argue the trial court erred when it rendered a take-nothing judgment against them and a judgment in favor of Milberger for damages because there was no evidence or, alternatively, insufficient evidence to: (1) establish Milberger gave them a written itemization of the charges for repairs as required by sections 92.104 and 92.109 of the Texas Property Code; (2) rebut the presumption that Milberger acted in bad faith when he failed to refund the security deposit or to give them a written itemization of the charges for repairs; (3) establish the charges Milberger offset against the security deposit were reasonable as required by the lease and section 92.109 of the Texas Property Code; (4) establish Milberger had a reasonable excuse for his failure to refund the security deposit or to give them a written itemization of the charges for repairs; and (5) support the award of $2,000 in damages to Milberger, in excess of the security deposit.

We conclude Milberger was not required to plead as affirmative defenses the absence of bad faith, that the charges offset against the security deposit were reasonable, or that he had a reasonable excuse for failing to give the Pulleys an itemized list of the deductions. Also, we conclude there was sufficient evidence to support the trial court's take-nothing judgment against the Pulleys and judgment in favor of Milberger on his counterclaim awarding him $2,000 in damages. We decide all issues against the Pulleys. The trial court's judgment is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Milberger is a petroleum engineer and the president of an oil and gas engineering firm, and his occupation requires him to travel extensively. Before 1997, Milberger leased his 2,400 square foot house located at 6643 Garlinghouse Lane, Dallas, Texas to three different tenants. Milberger did not have any serious problems regarding the security deposits with his prior tenants.

On April 9, 1997, Milberger leased his house to Mr. Pulley, an attorney, and his wife. The lease agreement was on a form promulgated by the Greater Dallas Association of Realtors, Inc. Specific terms in the lease, relevant to this case, included: (1) a $3,700 security deposit; (2) Milberger may deduct from the security deposit reasonable charges for cleaning, deodorizing, damages, and repairs to the property or its contents beyond normal wear and tear as well as the cost of repairs for which the Pulleys are responsible; (3) the Pulleys were required to reimburse Milberger for any loss, property damage, or the cost of repairs or services to the property caused by the Pulleys' negligence or improper use of the property; and (4) Milberger was required to maintain the yard and the Pulleys were required to water the yard at reasonable and appropriate times.

Before the Pulleys began residing at the house, Milberger and his listing agent, Stacy Hamilton, walked through the house. Neither Milberger nor Hamilton observed any damage to the built-in china cabinet or the foundation. Also, four to five months before the Pulleys began residing at the house, Milberger had twenty-year, wear-dated Berber carpet installed. At the time the lease was signed, Milberger pro-

grammed the sprinkler system to water the yard pursuant to his discussions with the Pulleys and told Mr. Pulley that the system should remain turned on. During the time the Pulleys leased the house, Milberger paid for the maintenance and care of the yard.

The initial lease period was one year. After the first year, the Pulleys renewed their lease on a month-to-month basis. The Pulleys resided in the house for a total of six years. At one point during the Pulleys' tenancy, Mr. Pulley told Milberger he was having financial difficulties and asked Milberger to set aside half of the rent for four to six months. Milberger agreed and the Pulleys caught up on their rent payments four or five months afterward. The Pulleys were late in their rent payments thirteen times, but Milberger did not charge them any late fees as allowed by the lease. During the Pulleys' tenancy, Milberger did not increase the rent. On July 17, 2003, the Pulleys sent Milberger a letter notifying him that they would be vacating the house on August 18, 2003, and advising him that the sprinkler system was not working properly and needed repair.

Milberger asked Hamilton to re-lease the house when the Pulleys gave their notice. When Hamilton went to the house, she observed that the grass in the front yard was dead and the lawn was mainly soil. Milberger inspected the sprinkler system and found that it worked properly, but it had been turned off. Milberger had the front yard resodded and told the Pulleys the lawn had to be watered or the sod would die. The next morning, Milberger checked the sprinkler system and found that it had been turned off. Milberger turned the sprinkler system back on and wrapped a tie around it so it could not be turned off. However, when he checked the sprinkler system that evening, the tie

wrap had been removed and, again, the sprinkler system had been turned off. Meanwhile, Hamilton tried to show the house to prospective lessees. However, there were problems with people being able to get in to see the house and, once inside, people would turn around and walk out because of the urine smell in the master bedroom. As a result, the house was taken off the market.

The Pulleys surrendered the premises on August 18, 2003, and, at the house, they left a handwritten note addressed to Milberger advising him of their forwarding address. Within two days of the Pulleys' surrender of the premises, Milberger inspected the house. A couple of days later, he inspected the house a second time with Hamilton. In addition to the issues with the lawn, they observed that the foundation was cracked, the built-in china cabinet had three scratches approximately 6 inches long and 1/4 inch deep, the garage floor had a deep oil stain approximately 3 feet wide and 7 feet long, the living room and master bedroom carpets were badly stained, the master bathroom wall was stained and the toilet was encrusted with stains, and the master bedroom and bathroom had the strong odor of urine. Milberger took photographs of the damage and obtained estimates on the cost of repairs.

On August 22, 2003, Milberger sent the Pulleys a letter describing the damage to the house. Also, the letter stated, "As a result of the damages to the property that exceed what is considered reasonable wear and tear the resultant cost of repairs has exceed[ed] the [security] deposit." The Pulleys did not respond to his letter. As a result, Milberger telephoned the Pulleys once a week for three weeks, but no one took his calls and his messages were not returned. Then, on October 2, 2003, after thirty days had passed, the Pulleys sent

Milberger a demand letter for the $3,700 security deposit and advised him that they had engaged an attorney who would begin the collection process if their security deposit was not returned by October 15, 2003. The next day, Milberger responded to the Pulleys' demand letter. In Milberger's response, he invited the Pulleys to meet with him to review the documented damages, photographs taken the day after they vacated the house, and the costs incurred to repair the damage. Also, Milberger advised the Pulleys again that the damage was beyond normal wear and tear and the costs of the repairs exceeded the amount of their security deposit. The Pulleys did not respond to Milberger's invitation to review his documentation.

Milberger had the damage to the house repaired. When the carpet was pulled up, the smell was described as nauseating, the stains had permeated through to the back of the carpet and the padding, and the padding was crusty from urine residue. As a result, the carpet and padding had to be scraped up with a shovel and replaced. In the master bathroom, the drywall beside the toilet was cleaned with bleach, but the urine stains could not be removed so the drywall had to be replaced. Also, the toilet had to be removed because it was so heavily encrusted with urine stains. A month later, the bathroom had to be "redone" because the urine odor remained. The scratches on the counter top of the built-in china cabinet could not be repaired, so it was replaced. The oil on the garage floor was raked with a spatula and cleaned with acid. In addition, the foundation was repaired. It took approximately three months to repair the damage so the house could be shown to prospective lessees. Also, Milberger obtained the utility records for the house during the Pulleys' possession as well as similar houses in the neighborhood. After reviewing the utility records, he determined that the Pulleys had used thirty-five percent less water than similar houses in the neighborhood.

On June 9, 2004, approximately one year after the Pulleys notified Milberger they would be vacating the premises, the Pulleys sued Milberger to recover their security deposit. The Pulleys alleged that Milberger: (1) failed to return their security deposit within thirty days; (2) failed to account for the security deposit because, in bad faith, he did not furnish them with a written description and itemized list of the deductions; and, in the alternative, (3) improperly accounted for the security deposit because, in bad faith, he did not itemize the deductions and the sums were deducted for normal wear and tear. Milberger denied the allegations, asserted as an affirmative defense that he sent the Pulleys an itemized notice, and counterclaimed for $2,000 in damages above the amount of the security deposit. After a trial before the court, the trial court ordered that the Pulleys take nothing and awarded Milberger $2,000 for damages exceeding the Pulleys' security deposit, $160 in prejudgment interest, $4,000 in attorneys fees, and an additional $6,500 if he prevails on appeal, or $7,500 if a writ is granted.

The trial court entered the following findings of fact and conclusions of law:

### The Pulleys Claim Against Milberger

1. Pursuant to the written lease agreement in evidence, the parties had a landlord-tenant relationship.

2. The Pulleys, the tenants pursuant to the lease, gave notice of their forwarding address.

3. Keith Milberger, the landlord, did not act in bad faith when he failed to return the security deposit.

### Keith Milberger's Claim Against the Pulleys

1. Milberger's damages exceed the security deposit by $2,000.

2. Through the trial of the case, Milberger's attorneys fees were $4,000; and for direct appeal, his attorneys fees would be $6,500; and if writ of error were granted, his attorneys fees would be $7,500.

The Pulleys requested additional findings of fact and conclusions of law and filed a motion for new trial, both of which the trial court denied.

## II. PLEADING REQUIREMENTS

■ In issues two through four, the Pulleys argue the trial court erred when it rendered a take-nothing judgment against them and a judgment in favor of Milberger for damages because Milberger failed to plead: (1) the absence of bad faith to refund their security deposit or give them a written itemization of the charges for repairs; (2) the charges he offset against the security deposit were reasonable as required by the lease and section 92.109 of the Texas Property Code; and (3) he had a reasonable excuse for his failure to refund the security deposit or give them a written itemization of the charges for repairs. Milberger responds that he was not required to plead these issues as affirmative defenses and the Pulleys did not object to his failure to plead them as affirmative defenses at trial.

Section 92.109 provides a tenant with a cause of action against his landlord when the landlord fails to return a security deposit or to provide a written description of the damages and an itemized list of the deductions by the thirtieth day after the tenant surrenders the premises. *See* TEX. PROP.CODE ANN. § 92.109 (Vernon 1995). When a tenant offers proof that the landlord's conduct was as set out in section 92.109, the landlord is presumed to have acted in bad faith. *See id.* § 92.109(d). Unless that presumption is rebutted, the landlord will be subject to the monetary sanctions imposed under section 92.109.

*See* TEX. PROP.CODE ANN. § 92.109(a), (b). In addition to rebutting the presumption of bad faith, in order to defend against the tenant's cause of action, the landlord has the burden to prove "the retention of any portion of the security deposit was reasonable." *See* TEX. PROP.CODE ANN. § 92.109(c).

■ Pleading an affirmative defense permits the introduction of evidence, which does not tend to rebut the factual propositions asserted in the plaintiff's case, but seeks to establish an independent reason why the plaintiff should not recover. *See Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 546 (Tex.1991). An affirmative defense is a matter asserted in avoidance of a party's argument or position, rather than a matter asserted in denial of that party's position. *See Gorman*, 811 S.W.2d at 546; *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.-Dallas 2005, pet. denied).

A landlord's rebuttal of the statutory presumption of bad faith and proof of the reasonableness of his retention of the security deposit is asserted by his denial of the tenant's claims of bad faith retention of the security deposit. His denial is not asserted to establish an independent reason why the tenant should not recover. *See Gorman*, 811 S.W.2d at 546. Accordingly, we conclude Milberger was not required to plead as affirmative defenses the absence of bad faith, that the charges offset against the security deposit were reasonable, or that he had a reasonable excuse for failing to refund the security deposit or give the Pulleys an itemized list of the deductions.

Issues two through four are decided against the Pulleys.

## III. SUFFICIENCY OF THE EVIDENCE

In issues one and five through seven, the Pulleys argue the trial court erred when it

rendered a take-nothing judgment against them and a judgment in favor of Milberger for damages because there was no evidence or, alternatively, insufficient evidence to: (1) establish Milberger gave them a written itemization of the charges for repairs as required by sections 92.104 and 92.109 of the Texas Property Code; (2) rebut the presumption that Milberger acted in bad faith when he failed to refund the security deposit or to give them a written itemization of the charges for repairs; (3) establish the charges Milberger offset against the security deposit were reasonable as required by the lease and section 92.109 of the Texas Property Code; (4) establish Milberger had a reasonable excuse for his failure to refund the security deposit or to give them a written itemization of the charges for repairs; and (5) support the award of $2,000 in damages to Milberger, in excess of the security deposit.

### A. Standard of Review

■ Findings of fact in a case tried to the court have the same force and effect as jury findings. *See Cent. Forest S/C Partners, Ltd. v. Mundo–Mundo, Inc.,* 184 S.W.3d 296, 300 (Tex.App.-Dallas 2005, no pet. h.); *Spethmann v. Anderson,* 171 S.W.3d 680, 688 (Tex.App.-Dallas 2005, no pet. h.); *Gregory v. Sunbelt Sav., F.S.B.,* 835 S.W.2d 155, 158 (Tex.App.-Dallas 1992, writ denied). An appellate court reviews a trial court's fact findings by the same standards it uses to review the sufficiency of the evidence to support a jury's findings. *See Cent. Forest,* 184 S.W.3d at 300.

When an appellant attacks the legal sufficiency of an adverse finding on an issue for which he did not have the burden of proof, he must demonstrate there is no evidence to support the adverse finding. *See Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Case Corp. v. Hi–Class*

*Bus. Sys. of America, Inc.,* 184 S.W.3d 760, 769 (Tex.App.-Dallas 2005, no pet. h.). A legal sufficiency review of a no-evidence point must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005). An appellate court will sustain a no-evidence point when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003); *Mary Kay, Inc. v. Woolf,* 146 S.W.3d 813, 817 (Tex.App.-Dallas 2004, pet. denied), *cert. denied,* 544 U.S. 1061, 125 S.Ct. 2530, 161 L.Ed.2d 1112 (2005); *see City of Keller,* 168 S.W.3d at 807. Anything more than a scintilla of evidence is legally sufficient to support a trial court's finding. *See Marathon,* 106 S.W.3d at 727.

■ When an appellant challenges the factual sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the appellant must demonstrate there is insufficient evidence to support the adverse finding. *Dallas County v. Holmes,* 62 S.W.3d 326, 329 (Tex.App.-Dallas 2001, no pet.) (citing *Croucher,* 660 S.W.2d at 58). In reviewing a factual sufficiency challenge, an appellate court considers and weighs all of the evidence in support of and contrary to the trial court's finding and will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). When conducting a

factual sufficiency review of a trial court's findings, an appellate court will not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact. *See Holmes,* 62 S.W.3d at 329; *Tex. Farmers Ins. Co. v. Cameron,* 24 S.W.3d 386, 392 (Tex.App.-Dallas 2000, pet. denied). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Barnett v. Coppell N. Tex. Court, Ltd.,* 123 S.W.3d 804, 813–14 (Tex.App.-Dallas 2003, pet. denied).

 It is presumed that all fact findings needed to support the judgment were made by the trial court. *See Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d 274, 276 (Tex.1979). When the trial court's express findings of fact do not address all grounds for recovery or defenses, an appellate court implies findings of fact regarding the omitted grounds or defenses that are needed to support the judgment. *See generally, Hailey v. Hailey,* 176 S.W.3d 374, 383–84 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (discussing implied findings for missing elements).

### B. Applicable Law

#### 1. Security Deposits—Landlord's Rights and Duties

Chapter 92, subchapter C of the Texas Property Code governs security deposits in residential leases. *See* TEX. PROP.CODE ANN. §§ 92.101–92.109 (Vernon 1995 & Supp.2005). A landlord's duty or a tenant's remedy concerning security deposits as provided in subchapter C may not be waived. *See* TEX. PROP.CODE ANN. § 92.006(a) (Vernon Supp.2005); *Hardy v. 11702 Mem'l, Ltd.,* 176 S.W.3d 266, 275 (Tex.App.-Houston [1st Dist.] 2004, no pet.). A security deposit is defined as "any advance of money, other than an advance payment of rent, that is intended primarily to secure performance under a lease of a dwelling." TEX. PROP.CODE ANN. § 92.102.

A landlord is required to refund a security deposit to the tenant on or before the thirtieth day after the date the tenant surrenders the premises. TEX. PROP.CODE ANN. § 92.103(a). However, before returning a security deposit, the landlord may deduct from the security deposit damages and charges for which the tenant is legally liable under the lease or as a result of breaching the lease. TEX. PROP.CODE ANN. § 92.104(a). The landlord may not retain any portion of the security deposit to cover normal wear and tear. TEX. PROP. CODE ANN. § 92.104(b).

If the landlord retains all or part of the security deposit, the landlord shall give the tenant, within thirty days of the tenant's surrender of the premises: (1) the balance of the security deposit, if any; (2) a written description of the damages; and (3) an itemized list of all deductions. *See* TEX. PROP.CODE ANN. § 92.104(c). However, the landlord is not obligated to return a tenant's security deposit or give the tenant a written description of the damages and an itemized list of the deductions until the tenant gives the landlord a written statement of the tenant's forwarding address for the purpose of returning the security deposit. *See* TEX. PROP.CODE ANN. § 92.107(a).

#### 2. Tenant's Claims

##### a. The Two Causes of Action

Chapter 92, subchapter C of the Texas Property Code establishes two causes of action that permit a tenant to seek recovery of his security deposit from his landlord. *See* TEX. PROP.CODE ANN. § 92.109. Each of these causes of action provides the tenant with a different remedy. *See id.*

The first cause of action involves a landlord's bad faith retention of the security deposit and is established in section 92.109(a). *See id.* § 92.109(a). To prevail under this cause of action, the tenant must prove the landlord: (1) acted in bad faith; and (2) retained the security deposit in violation of chapter 92, subchapter C of the Texas Property Code. *See id.* When a landlord is found liable under section 92.109(a), the tenant may recover from the landlord: (1) an amount equal to the sum of $100; (2) three times the portion of the security deposit wrongfully withheld; and (3) the tenant's reasonable attorney's fees in a suit to recover the security deposit. *See id.*

The premise of the second cause of action is a landlord's bad faith failure to account for the security deposit. *See id.* § 92.109(b). To prevail under this cause of action, the tenant must prove the landlord: (1) acted in bad faith; and (2) failed to provide the tenant with: (a) a written description of the damages in violation of chapter 92, subchapter C of the Texas Property Code; and (b) an itemized list of the deductions in violation of chapter 92, subchapter C of the Texas Property Code. *See id.* A landlord who is found liable under section 92.109(b): (1) forfeits the right to withhold any portion of the security deposit; (2) forfeits the right to sue the tenant for damages to the premises; and (3) is liable for the tenant's reasonable attorney's fees in a suit to recover the security deposit. *See id.; see also Ackerman v. Little,* 679 S.W.2d 70, 73 (Tex.App.-Dallas 1984, no writ).

**b. Presumption of Bad Faith**

■■■ When a tenant sues a landlord to recover his security deposit under either of the two causes of action, section 92.109(a) or section 92.109(b), the tenant must prove the landlord acted in bad faith.

*See* TEX. PROP.CODE ANN. § 92.109(a), (b). Bad faith is presumed when a landlord fails to: (1) return the security deposit; or (2) provide a written description of the damages and an itemized list of all deductions within thirty days after the tenant surrenders the premises. *See* TEX. PROP. CODE ANN. § 92.109(d). A landlord acts in bad faith when he retains the security deposit in dishonest disregard of the tenant's rights. *See Reed v. Ford,* 760 S.W.2d 26, 30 (Tex.App.-Dallas 1988, no writ); *Alltex Constr., Inc. v. Alareksoussi,* 685 S.W.2d 93, 94 (Tex.App.-Dallas 1984, writ ref'd n.r.e.). Bad faith implies an intention to deprive the tenant of a lawfully due refund. *See Reed,* 760 S.W.2d at 30; *Alltex Constr.,* 685 S.W.2d at 94; *Wilson v. O'Connor,* 555 S.W.2d 776, 780 (Tex.Civ. App.-Dallas 1977, writ dism'd); *Hardy,* 176 S.W.3d at 271; *Leskinen v. Burford,* 892 S.W.2d 135, 136 (Tex.App.-Houston [14th Dist.] 1994, no writ). Absent rebutting evidence, the presumption that the landlord acted in bad faith compels a finding of bad faith. *See Wilson,* 555 S.W.2d at 780; *Hardy,* 176 S.W.3d at 271.

■■■ To defeat the presumption of bad faith, the landlord must prove his good faith, i.e., honesty in fact in the conduct or transaction concerned. *Wilson,* 555 S.W.2d at 780–81; *Hardy,* 176 S.W.3d at 271. Evidence that a landlord had reason to believe he was entitled to retain a security deposit to recover reasonable damages is sufficient to rebut the presumption of bad faith created by the Texas Property Code. *See Wilson,* 555 S.W.2d at 780; *Leskinen,* 892 S.W.2d at 136. Other evidence may include: (1) the landlord is an amateur lessor because the residence is his only rental property; (2) the landlord had no knowledge of the requirement to submit an itemized list of all deductions from the security deposit; (3) extensive damage was done to the residence; (4) the landlord

attempted to do some of the repairs himself to save money; or (5) the landlord had a reasonable excuse for the delay, e.g., he was on vacation. *See Ackerman,* 679 S.W.2d at 74; *Wilson,* 555 S.W.2d at 781; *Leskinen,* 892 S.W.2d at 137–38.

### c. Reasonable Retention of the Security Deposit

Even when a landlord defeats the presumption of bad faith in an action under section 92.109(a) as to the failure to return security deposits, the landlord has another hurdle. He must prove the retention of any portion of the security deposit was reasonable. *See* TEX. PROP.CODE ANN. § 92.109(c) ("In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable."); *Ackerman,* 679 S.W.2d at 73; *cf. Wilson,* 555 S.W.2d at 779 (landlord has burden of proving reasonableness of deductions); *Jones,* 875 S.W.2d at 30. A landlord's retention of the security deposit may be reasonable if: (1) the tenant is legally liable under the lease or as a result of breaching the lease; (2) the damages did not exist before the tenant leased the premises; or (3) the damages or charges are equal to or in excess of the security deposit or the amount deducted from the security deposit. *See generally, Jones v. Falcon,* 875 S.W.2d 29, 31 (Tex. App.-Houston [14th Dist.] 1994, writ denied) (damage that existed before tenant moved in sufficient to raise fact issue regarding reasonableness of retention of security deposit); *Thrift v. Johnson,* 561 S.W.2d 864, 868–69 (Tex.Civ.App.-Houston [1st Dist.] 1977, no writ) (former statute construed to require landlord to prove tenant legally liable under lease or as result of breach, or charges equal to or in excess of security deposit or amount retained).

### 3. Damages

A landlord and tenant have the right to contract over whom will be responsible for conditions caused by the tenant, the tenant's occupant, or the tenant's guest. *See Churchill Forge, Inc. v. Brown,* 61 S.W.3d 368, 372 (Tex.2001). When there are no permanent damages to the premises, the landlord is entitled to the reasonable cost of repairs as the proper measure of damages if he waits until after the term of the lease has expired to seek damages. *See Siegler v. Robinson,* 600 S.W.2d 382, 386 (Tex.Civ.App.-Houston [1st Dist.] 1980, writ ref'd n.r.e.); *see also King's Court Racquetball v. Dawkins,* 62 S.W.3d 229, 235 (Tex.App.-Amarillo 2001, no pet.); *Nielson v. Okies,* 503 S.W.2d 614, 616 (Tex.Civ.App.-El Paso 1973, no writ). To establish the right to recover the costs of repair, it is not necessary for a landlord to use the words "reasonable" and "necessary" when introducing evidence of the cost of repairs. *See Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 548 (Tex.App.-El Paso 2001, no pet.) (construing *Ebby Halliday Real Estate,* 916 S.W.2d 585, 589 (Tex.App.-Fort Worth 1996, writ denied)). Also, a landlord need not establish the amount of damages with mathematical precision. *See King's Court,* 62 S.W.3d at 236. Instead, a landlord needs only to present sufficient evidence to justify a finding that the costs were reasonable and the repairs were necessary by the trier of fact. *See Z.A.O.,* 50 S.W.3d at 548. A landlord needs only to bring forward the best evidence of the amount of damages that the situation admits and from which reasonable inferences can be made. *See King's Court,* 62 S.W.3d at 236.

### C. *Application of the Law to the Facts*

We will address the Pulleys' issues by conducting our analysis in two parts so

that similar legal issues are grouped together. The first part includes issues one, five, and seven, which address the Pulleys' claims for bad faith failure to return the security deposit and bad faith failure to account for the security deposit. The second part of our analysis includes issue six, which has two subissues that address the reasonableness of the retention of the security deposit and damages.

## 1. Bad Faith Failure to Return the Security Deposit and Bad Faith Failure to Account for the Security Deposit

The first group of issues, one, five, and seven, address two different causes of action that hinge on the ultimate issue of whether Milberger acted in bad faith under section 92.109(a) and (b) of the Texas Property Code. First, with respect to their claim for bad faith failure to return the security deposit, the Pulleys essentially contend that Milberger failed to rebut the presumption of bad faith and failed to establish a reasonable excuse for failing to refund the security deposit. Second, with respect to their claim for bad faith failure to account for the security deposit, the Pulleys essentially contend Milberger failed to rebut the presumption of bad faith, failed to establish a reasonable excuse for failing to itemize the deductions from the security deposit, and failed to establish he gave the Pulleys a written itemization of the deductions from the security deposit. In order to address the Pulleys' claim of bad faith failure to account, we will assume, without deciding, that Milberger failed to establish he gave the Pulleys a written itemization of the deductions from the security deposit.

Accordingly, in order to properly address the Pulley's sufficiency of the evidence argument, we condense issues one, five, and seven to challenges regarding:

(1) the trial court's finding of fact that "[M]ilberger, the landlord, did not act in bad faith when he failed to return the security deposit"; and (2) because the trial court made no finding of fact as to the Pulleys' claim that Milberger failed to account for the security deposit, an implied finding of fact that Milberger did not act in bad faith when he failed to provide the Pulleys with an itemized list of the deductions. *See Carter,* 584 S.W.2d at 276 (presume all findings necessary to support judgement); *see generally, Hailey,* 176 S.W.3d at 383–84 (discussing implied findings for missing elements).

Milberger responds that he defeated the presumption of bad faith because: (1) his letters to the Pulleys were sufficient to comply with the statute because, in his first letter, he provided a written description of the damages within thirty days and, in his second letter, he offered to review the documented damages, his photographs, and the costs of repairs with the Pulleys; and (2) the Pulleys failed to respond to his letters and telephone calls.

The Pulleys argue Milberger failed to establish a reasonable excuse for both his failure to itemize the deductions from the security deposit and his failure to return the security deposit. However, a reasonable excuse is merely one means by which a landlord may rebut the presumption of bad faith. *See Ackerman,* 679 S.W.2d at 74; *Wilson,* 555 S.W.2d at 781; *Leskinen,* 892 S.W.2d at 137–38. A landlord may defeat the presumption of bad faith with evidence that he had reason to believe he was entitled to retain the security deposit to recover reasonable damages. *See Wilson,* 555 S.W.2d at 780; *Leskinen,* 892 S.W.2d at 136. Accordingly, we will review the evidence, if any, respecting "a reasonable excuse" in conjunction with other evidence to determine if the evidence

is sufficient to rebut the presumption of bad faith.

■■■■■ At trial, there was evidence that Milberger was an amateur landlord. *See Ackerman,* 679 S.W.2d at 74 (evidence landlord was amateur landlord probative to show good faith); *Leskinen,* 892 S.W.2d at 137–38 (status as amateur lessor does not favor presumption of bad faith). He testified he is a petroleum engineer, the house is his only rental property, he had only three tenants before the Pulleys, and, prior to this dispute, he has not had problems regarding the security deposit. Also, there was evidence that, based on the terms of the lease and his discussions with Hamilton, Milberger believed he could retain the security deposit because of the damage to the house. *See Leskinen,* 892 S.W.2d at 136 (evidence landlord believed he was entitled to retain security deposit to recover reasonable charges or damages sufficient to rebut bad faith presumption). In addition, there was testimony that the damage to the house was extensive and photographs depicting that damage were admitted into evidence. Finally, even assuming Milberger failed to give the Pulleys an itemized list of the deductions, which complies with the requirements of the statute, there was evidence that Milberger sent the Pulleys a written description of the damage and offered to show the Pulleys his documentation, photographs, and the costs of the repairs. However, the Pulleys did not respond.

Applying the prevailing standards of review, we conclude there was legally and factually sufficient evidence to support the trial court's finding of fact that "[M]ilberger, the landlord, did not act in bad faith when he failed to return the security deposit" and implied finding of fact that Milberger did not act in bad faith when he failed to provide the Pulleys with an itemized list of the deductions. Issues one, five, and seven are decided against the Pulleys.

## 2. Reasonableness of the Retention of the Security Deposit and Damages

Issue six includes two subissues, which comprises the second part of our analysis. First, we address the reasonableness of the retention of the security deposit. Second, we address the damages awarded to Milberger.

As it relates to the Pulleys' claims for bad faith failure to return the security deposit under section 92.109(a), which seeks, in part, to recover their security deposit, we will address the issue as a challenge to the trial court's implied finding of fact that Milberger's retention of the security deposit was reasonable under section 92.109(c). Also, as to Milberger's counterclaim for damages, we will address this issue as a challenge to the sufficiency of the evidence to support the trial court's: (1) finding of fact that "Milberger's damages exceed the security deposit by $2,000"; and (2) implied findings of fact that $2,000 was a reasonable cost for those repairs and the repairs were necessary. *See Carter,* 584 S.W.2d at 276 (presume all findings necessary to support judgement); *see generally, Hailey,* 176 S.W.3d at 383–84 (discussing implied findings for missing elements).

The Pulleys assert that proof of the reasonableness of the repair costs is the only proof that will satisfy Milberger's burden under section 92.109(c) to retain the security deposit and that Milberger may only deduct "reasonable charges" from the security deposit for "damages and repairs" pursuant to the lease. Further, they contend there was no proof that Milberger's charges were reasonable.

■■■■ Although the Pulleys and Milberger both presented argument to us regard-

ing the proof of "reasonable charges" or whether "the damages were reasonable," they did not focus first on the pivotal issue in section 92.109(c). That section states:

> (c) In an action brought by a tenant under this subchapter, the landlord has the burden of proving that the retention of any portion of the security deposit was reasonable.

See TEX. PROP.CODE ANN. § 92.109(c). When a landlord is sued under section 92.109(a), the landlord has the burden to prove that the *retention* of the security deposit was reasonable, not that the repair costs were reasonable. However, proof of the reasonableness of the repair costs may be necessary to satisfy the requirement of proving the reasonableness of the "retention." See TEX. PROP.CODE ANN. § 92.104(a) (landlord may deduct from security deposit damages and charges for which the tenant is liable under the lease).

At trial, the lease was admitted into evidence showing the Pulleys were legally responsible for damage and repairs beyond normal wear and tear. The lease states, in part:

> *Deductions:* Landlord may deduct reasonable charges from the security deposit for: (i) unpaid or accelerated rent; (ii) late charges; (iii) unpaid utilities; (iv) cleaning, deodorizing, damages, and repairs to the Property or its contents beyond normal wear and tear; (v) pet violation charges; (vi) cost of repairs for which Tenant is responsible; (vii) replacing unreturned keys, garage door openers or other security devices; (viii) the removal of unauthorized locks or fixtures installed by Tenant; (ix) pest control if required; (x) insufficient light bulbs; (xi) packing, removing, and storing abandoned property; (xii) costs of reletting, including brokerage fees; (xiv) attorney fees and costs of

court incurred in any proceeding against Tenant; (xv) any fee due for early removal of an unauthorized keybox; and (xvi) other items provided by this Lease. If deductions exceed the security deposit, Tenant will pay the Landlord the excess within ten (10) days after Landlord makes written demand. The security deposit will be applied first to non-rent items, including late charges, returned check charges, repairs, brokerage fees, and periodic utilities, if any, then to any unpaid rent.

Although Milberger was required, under section 92.109, to prove that the retention of the security deposit was reasonable, the lease only permitted him to deduct reasonable charges from the security deposit. See also TEX. PROP.CODE ANN. § 92.104(a). As a result, in order for Milberger's retention of the security deposit to be reasonable, the deductions must be for reasonable charges. Additionally, in order to collect damages in excess if the security deposit, the cost of the repairs must be reasonable charges. Accordingly, we review both the retention of the security deposit and the additional $2,000 in damages for sufficient evidence that the costs of the repairs were reasonable.

■ At trial, there was evidence that the damage to the house did not exist before the Pulleys' occupancy. Milberger and Hamiton stated they did not observe any damage to the built-in china cabinet or the foundation before the Pulleys moved in. Also, Milberger stated the carpet was installed four to five months before the Pulleys occupied the house, the house was unleased when the carpet was installed, and it was brand new when the Pulleys took possession.

Milberger and Hamiton stated that the damage was beyond normal wear and tear. Milberger described the extent of the dam-

age and his letter to the Pulleys detailing the damage to the premises was admitted into evidence. He stated that before he sent his first letter to the Pulleys describing the damage and stating that the cost of repairs exceeded the security deposit, he had professionals come to the house and provide him with estimates on the cost of repairs. Milberger described in detail the repairs made to the house and the extent to which the repairs required additional work, e.g., the oil on the garage floor was so thick it had to be raked with a spatula and took two days to clean, the carpet was so crusty with urine it would break into little pieces and, as a result, it could not be pulled up in strips, but had to be scraped up with a shovel, and the urine stains on the master bathroom wall could not be cleaned with bleach so the drywall had to be replaced. Hamilton also testified regarding some of the damage to the house. She stated the house had to be removed from the market until the repairs were made because it was not in a marketable condition. In addition, there was photographic evidence of the damage to the premises.

Milberger testified regarding his total cost of the repairs in three different ways. However, the Pulleys did not present contrary evidence. First, Milberger described his total cost of repairs as $3,500 in excess of the $3,700 security deposit. Second, he stated his total cost of repairs was $6,000, not including the cost of the repairing the foundation. Third, he related that the total cost of repairs was $9,700. He specifically stated that the cost of repairing the foundation was $3,700 and the cost of painting and repairing the drywall in the master bathroom was $1,300. Also, Milberger stated he claimed only $2,000 in excess of the security deposit because he prorated the cost of repairs, e.g., he calculated the Pulleys should pay $250 for the painting and replacement of the drywall in the master bathroom, instead of the full $1,300, because after six years they should not have to pay for painting the entire house, just the master bathroom where the wall was stained with urine. In addition, Milberger stated he did not include the cost of the sod in his request for damages. We conclude that, although Milberger's evidence did not employ the words "reasonable" and "necessary" when describing the cost of repairs, there is sufficient evidence for the fact-finder to reach that conclusion. *See Z.A.O.,* 50 S.W.3d at 548.

With respect to the Pulleys' lawsuit to recover their security deposit, we conclude there was legally and factually sufficient evidence to support the trial court's implied finding of fact that Milberger's retention of the security deposit was reasonable. As to Milberger's counterclaim for damages, we conclude there was legally and factually sufficient evidence to support the trial court's finding of fact that "Milberger's damages exceed the security deposit by $2,000" and implied findings of fact that $2,000 was a reasonable cost for those repairs and the repairs were necessary. *See Z.A.O.,* 50 S.W.3d at 548.

Issue six is decided against the Pulleys.

## IV. CONCLUSION

Milberger was not required to plead as affirmative defenses the absence of bad faith, that the charges offset against the security deposit were reasonable or that he had a reasonable excuse for failing to give them an itemized list of the deductions. Also, there was sufficient evidence to support the trial court's take nothing judgment against the Pulleys and judgment in favor of Milberger on his counterclaim and awarding him $2,000 in damages.

The trial court's judgment is affirmed.