**BLEDSOE DODGE, L.L.C. d/b/a Bankston Dodge of Grand Prairie, Appellant,**

v.

**Matt KUBERSKI, Appellee.**

**No. 05–08–00071–CV.**

Court of Appeals of Texas, Dallas.

Jan. 30, 2009.

Rehearing Overruled April 20, 2009.

David F. Farris, Lively and Associates, LLP, Fort Worth, TX, for Appellant.

Chad Baruch, Law Office of Chad Baruch, Rowlett, Mark D. Frenkel, Frenkel & Frenkel, LLP, Dallas, TX, for Appellee.

Before Justices WRIGHT, RICHTER, and LANG.

## OPINION

Opinion by Justice WRIGHT.

Bledsoe Dodge, L.L.C. d/b/a Bankston Dodge of Grand Prairie (Bledsoe Dodge) appeals from a judgment awarding damages for a cash price violation. In four issues, Bledsoe Dodge contends generally: (1) the trial court's interpretation of certain provisions of the finance code conflicts with federal law; (2) the trial court erred in finding a cash price violation; and (3) there is insufficient evidence to support the damages award. We sustain Bledsoe Dodge's second issue, reverse the trial court's judgment, and render judgment that Kuberski take nothing on his cash price violation claim.

### Background

Matt Kuberski went to Bledsoe Dodge to purchase a new truck. He was trading in his old truck. At that time, Kuberski owed more on his truck than it was worth. Kuberski's primary concern was that his monthly payment be within a certain range. The sales contract, as negotiated, listed the negative equity into the purchase price of the truck. With payments agreed upon within his desired range, Kuberski purchased the truck from Bledsoe Dodge.

Subsequently, Kuberski sued Bledsoe Dodge. In his second amended petition, Kuberski asserted causes of action for fraud, violations of the deceptive trade practices act, and a cash price violation under the finance code. During a bench trial, Kuberski nonsuited all of his claims except the cash price violation. After Kuberski rested his case, his counsel moved for a directed verdict and the trial court granted it. This appeal timely followed.

### Standard of Review

Rather than a motion for directed verdict, the proper motion to make after the plaintiff rests in a bench trial is a motion for judgment. *Matheus v. Sasser*, 164 S.W.3d 453, 457 (Tex.App.-Fort Worth 2005, no pet.). The distinction is important because we review a judgment pursuant to a motion for judgment differently than a directed verdict. *Qantel Bus. Sys., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 303–04 (Tex.1988). Because the motion was brought after the plaintiff rested in a bench trial, we will construe appellee's motion for directed verdict as a motion for judgment. *Fondren Constr. Co., Inc. v. Briarcliff Housing Dev. Assocs., Inc.*, 196 S.W.3d 210, 216 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

The trial court, as the fact finder in a bench trial, may rule on the factual and legal issues at the close of the plaintiff's case in chief. *Qantel Bus. Sys., Inc.* 761 S.W.2d at 304. In doing so, the trial court is presumed to have ruled on both the sufficiency of the evidence and on the weight of the evidence and credibility of the witnesses. *Id.*, at 304–05. Findings of fact in a case tried to the court have the same force and effect as jury findings. *Pulley v. Milberger*, 198 S.W.3d 418, 426 (Tex.App.-Dallas 2006, pet. denied). When an appellant challenges a trial court's findings of fact, an appellate court reviews those fact findings by the same standards it uses to review the sufficiency of the evidence to support a jury's findings. *Id.* In a legal sufficiency review, we view the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact finder could, and disregarding

contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). When reviewing the factual sufficiency of evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Cameron v. Cameron,* 158 S.W.3d 680, 683 (Tex.App.-Dallas 2005, pet. denied).

### Cash Price Violation

▪ Kuberski alleged that Bledsoe Dodge committed a cash price violation. In its second issue, Bledsoe Dodge contends the trial court erred in finding a cash price violation and that the negative equity constituted a finance charge. Bledsoe Dodge contends that the complained-of conduct did not constitute a cash price violation. For reasons that follow, we agree.

▪ A cash price violation occurs when a dealership establishes a cash price for the vehicle, but sells the vehicle for more than the price established. *Collins v. Fred Haas Toyota,* 21 S.W.3d 606, 607 (Tex.App.-Houston [1st Dist.] 2000, no pet.). The finance code defines cash price as the "price at which the retail seller offers in the ordinary course of business to sell for cash the goods or services that are subject to the transaction." TEX. FIN.CODE ANN. § 348.004(a) (Vernon 2006). The underlying purpose of a cause of action for a cash price violation is to prevent a dealership from charging a finance customer more than a cash customer for the same vehicle. *Collins,* 21 S.W.3d at 607. In *Collins,* the plaintiff entered into a financing agreement and purchased a car from the dealership. He later sued complaining of a cash price violation when he learned that on the same day that he purchased the car, the dealership advertised it for less than the price he had paid. *Id.* at 607. The trial court granted summary judg-

ment for the dealership on the basis that an advertisement cannot establish a cash price unless it is relied upon. *Id.* The court of appeals reversed. The court held that reliance is not an element of a cash price violation. *Id.* at 608.

▪ The cash price and the negotiated price agreed upon between the dealership and the buyer are not the same. The finance code provides that the retail installment contract must contain the "cash price of the retail installment transaction." TEX. FIN.CODE ANN. § 348.102(a)(5) (Vernon 2006). It is the negotiated price that the retail installment contract must contain, not the cash price that the dealership offered the vehicle in the ordinary course of business to all customers. As noted by the court in *Collins,* the cash price of the vehicle was the price the dealership "offered the vehicle in the ordinary course of business to all customers, not the price ultimately agreed on and stated in the contract." *Collins,* 21 S.W.3d at 608.

▪ The trial court found a violation because the "negative equity that was rolled into this retail installment contract was not put in the proper location." In his appellee's brief, Kuberski states "Bledsoe's inclusion of financed negative equity in Mr. Kuberski's contracted-for cash price violated the Texas Finance Code and federal disclosure requirements." However, failure to separately disclose the negative equity is not relevant to a determination of a cash price violation. Moreover, the *contracted—for* cash price, alone, does not determine a cash price violation under the finance code. *See Collins,* 21 S.W.3d at 607.

Kuberski relies upon a bankruptcy opinion for support for his contention that cash price cannot include negative equity. *See In re Sanders,* 377 B.R. 836 (Bankr. W.D.Tex.2007). The issue in *Sanders* was whether negative equity from a car loan is

part of the lender's purchase money security interest which would make it a fully secured claim under the bankruptcy code. *See id.* at 841–42. The court focused on the meaning of "price of the collateral" as used in the UCC. Looking to the provisions of the finance code, the court determined that negative equity is not part of the cash price for purposes of determining whether it is part of a lender's purchase money security interest. *Id.* at 850–51. The court in *Sanders* held that because the lender's claim contained non-purchase money debt, its claim did not qualify as a fully secured claim. *Id.* at 864. Unlike the issue in *Sanders,* the issue in this case is whether including the negative equity in the cash price as listed on the contract, meant that Kuberski paid a higher price for the car than the price Bledsoe Dodge offered it in the ordinary course of business. For this reason, we find the holding in *Sanders* inapplicable.

The parties agree that the cash price listed on line 1a of the installment contract included the $6,100 in negative equity. As found by the trial court, the listed cash price minus the $6,100 is $27,350.92. There is no evidence in the record that the dealership offered the same vehicle to a cash customer for less than $27,350.92. To prove a cash price violation, Kuberski had to prove that Bledsoe Dodge offered the truck in the ordinary course of business at a lower price. This he failed to do. Accordingly, the evidence does not support the trial court's determination of a cash price violation. *See Collins,* 21 S.W.3d at 607.

▆▆ Bledsoe Dodge also complains of the trial court's determination that the negative equity constituted a finance charge. We recognize that the record contains testimony that the negative equity was a charge incident to financing. This evidence, however is contrary to the law.

The finance code does not define the term finance charge. The finance code provides that the disclosure requirements of Regulation Z under the Truth in Lending Act apply to retail installment contracts in Texas. *See* TEX. FIN.CODE ANN. § 348.009 (Vernon 2006). Regulation Z defines finance charge as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4 (2003). Negative equity does not fit within this definition.

Bledsoe Dodge relies upon a case factually on point that held that negative equity is not a finance charge. *See Slover–Becker v. Pitre Chrysler Plymouth Jeep of Scottsdale, Inc.,* 409 F.Supp.2d 1158 (D.Ariz. 2005). *Slover–Becker* is instructive in recognizing that negative equity is not a cost to a credit customer. In that case, the plaintiff traded in her old car on the purchase of a new car. As in this case, the plaintiff's old car had a negative equity and the dealership rolled the negative equity into the purchase price of the new car. *Id.* at 1159. The plaintiff sued alleging that the failure to separately disclose the negative equity violated federal regulations. *Id.* at 1159–60. The court held that, while it is perhaps a better practice to separately disclose the negative equity, failure to do so does not constitute a violation. *Id.* at 1163. In reaching its holding, the court addressed whether the negative equity constituted a finance charge. The court concluded that the increase in sales price was not a result of the fact that the plaintiff was buying the car on credit. Rather, the increase in sales price was the result of the negative equity in the car she was trading in. Thus, the court concluded that the negative equity was not a charge incident to or a condition of an extension of credit. *Id.* at 1163. We agree with the reasoning in *Slover–Becker.* The $6,100

was not a charge incurred because Kuberski was a credit customer. It is the amount he owed on his old truck after the trade-in allowance. It was not an amount payable by him and imposed by the creditor as an incident or condition of the extension of credit. Thus, we conclude the trial court erred in determining that the $6,100 was a finance charge.

We conclude the evidence is insufficient to support the trial court's finding of a cash price violation. The trial court also erred in finding that the negative equity constituted a finance charge. Accordingly, we sustain Bledsoe Dodge's second issue, reverse the trial court's judgment, and render judgment that Kuberski take nothing on his cash price violation claim.